EMORY M. NEWTON *vs.* STATE OF MARYLAND.

*Criminal Law—Removal of Case—Conspiracy to Defraud—
"Blind Pool"—False Financial Statement—Valuation of
Assets—Evidence—Remarks of Court—
Prejudicial Error.*

The fact that two persons jointly indicted with appellant
for conspiracy were convicted by three judges of the Supreme
Bench of Baltimore City does not compel the conclusion that
appellant could not secure a fair trial by a jury in that city, and
that it was consequently an abuse of discretion to refuse a
removal to another jurisdiction, each juror having denied that
he would be influenced in his verdict on the trial of appellant
by the verdict of the three judges on the trial of the others.
pp. 75-77

A suggestion of removal is addressed to the sound judicial
discretion of the trial court, and its action thereon is not ground
for reversal in the absence of anything in the record to show
an abuse of discretion.                              p. 77

On a prosecution for conspiracy in publishing a false state-
ment as to the financial condition of a "blind pool" concern,
which statement was in part based on a valuation placed upon
a particular stock included in the assets of the concern, *held*
that evidence as to the value of the stock was wrongfully ex-
cluded.                              pp. 78-83

That the alleged false statement as to solvency included
averments that the concern dealt largely in "listed securities"
and that the inventory of its securities "at the market" showed
a substantial surplus, did not render inadmissible evidence as
to the value of the stock in question, although it was not
"listed" and had but a limited market.              pp. 78-83

Where corporate stock is not listed on an exchange, and has
no regular market value, evidence of the value of the corpora-
tion's assets, and its indebtedness, liabilities, or insolvency is
admissible to show the value of the stock; or such value may

be determined by ascertaining the nature, amount, and permanency of its business, the dividends paid, the control of the stock, the market for the articles sold, and other circumstances.

p. 82

A question asked of an accountant as to whether, on examination of a certain audit, he found all the receipts properly and fairly accounted for on the books, was properly excluded as asking the witness a question of law.                    p. 84

A question asked an accountant whether the books of a certain concern showed it "to be capable of meeting all obligations and contracts" as of a date named, was improper as asking the witness to construe the contracts, the only contract in evidence being one on which different constructions had been placed, and the construction of such contract being a matter of law to be passed on by the jury in a criminal case.                    pp. 84, 85

That, after an accountant had testified, as a witness for the defendant in a criminal case, as to a profit shown by certain papers, a remark by the court to the witness, "You know better than that," was reversible error, it being for the jury to pass upon the credibility of witnesses.                    pp. 86-88

That, after an accountant, testifying for defendant in a criminal case, involving the truth of a financial statement, had stated that, in preparing the statement, he called certain notes "securities," and counsel for defendant had stated that in so doing the witness was supported by decisions of the Court of Appeals, the court said, in the hearing of the jury, that "I would be very sorry to think that the Court of Appeals would make any such foolish decision as that," involved reversible error.

pp. 86, 88

The term "securities" includes evidence of indebtedness, and embraces bills of exchange, bonds for the payment of money, and promissory notes.                    p. 88

On a prosecution for a conspiracy to defraud by publication of a false statement as to the financial condition of one of the alleged conspirators, that certain letters were obtained from the latter's bankruptcy trustee was not a sufficient authentication to justify their admission in evidence, there being no proof as to their signatures nor from whom they were received by the trustee.                    pp. 88, 89

· On the trial of one defendant under an indictment for conspiracy, while letters between such defendant and another of the alleged conspirators might be admissible to show their relationship, letters between such other and strangers to the alleged conspiracy, having no reference thereto, are not admissible.

p. 89

On the trial before a jury of one defendant under an indictment for conspiracy, it was improper to allow the cross-examination of another of the alleged conspirators merely for the purpose of showing that, on the latter's trial under the same indictment, he had given similar testimony, and that the three judges before whom he was tried disbelieved his testimony and convicted him.                                        pp. 89, 90

If it is sought to impeach the credibility of a witness by showing that he has been convicted of a crime, he should be asked the question directly, and he should not be asked whether he was not convicted in a case in which he gave similar testimony.                                                         p. 90

On a prosecution for conspiracy to defraud by the publication of a false statement as to the financial condition of a person conducting a "blind pool," evidence was properly admitted that an involuntary petition in bankruptcy had been filed against such person shortly before the alleged conspiracy.  p. 90

Evidence was also properly admitted as to the publication in the local newspapers of a challenge to the managers of all "blind pools" to submit their books for inspection, this supplying a possible motive or reason for the alleged conspiracy. p. 91

Where books of account are in evidence, an expert accountant may properly be allowed to give the results of his examination thereof.                                               p. 91

Improper and prejudicial remarks made by the prosecuting attorney having been stricken out on motion, and the traverser at the time asking for no other action on the part of the court, *held* that the failure of the court to warn the jury to disregard the remarks, as it should have done, did not constitute cause for reversal.                                                  p. 92

On a prosecution for conspiracy to defraud by the publication of a false statement as to the financial condition of a "blind pool" concern, which statement was in part based on a valuation placed upon a particular stock included in the concern's assets, one of the alleged conspirators, testifying that such valuation was based on a written offer for such stock, should have been allowed to state circumstances known to him affecting the value of the offer.                    pp. 92, 93

Where the court, over defendant's objection, allowed the State to offer in evidence a portion of a certain instrument, the defendant was entitled to have the entire instrument admitted.                              p. 93

*Decided December 4th, 1924.*

Appeal from the Criminal Court of Baltimore City (STEIN, J.).

Criminal proceeding against Emory M. Newton. From a judgment of conviction and sentence, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES and PARKE, JJ.

*Albert S. J. Owens* and *John D. Nock,* for the appellant.

*Roland K. Adams, Deputy State's Attorney for Baltimore City,* and *Eugene A. Edgett,. Assistant State's Attorney,* with whom was *Herbert R. O'Conor, State's Attorney,* on the brief, for the State.

OFFUTT, J., delivered the opinion of the Court.

The appellant in this case was tried and convicted in the Criminal Court of Baltimore City of a criminal conspiracy, for which he had been indicted jointly with William A. Gillespie and Harold R. Dickey, Jr., and from the judgment on the verdict in that case he has taken this appeal.

Demurrers to the indictment filed by each defendant were overruled, and Gillespie and Dickey were tried before the court and convicted on June 23rd, 1923. On September 24th, 1923, Newton filed a suggestion and affidavit for removal, which was also overruled. He then pleaded not guilty and was tried by the jury, with the result stated above.

The record contains eighty-five exceptions, eighty-four of which relate to remarks made by the court and by the State's Attorney during the progress of the trial, and to rulings of the court upon questions of evidence, and these rulings, together with the action of the court on the demurrer to the indictment, and its action upon the suggestion and affidavit for removal, we are now asked to review.

The facts material to a consideration of the questions before us are sufficiently set out in the cases of *State v. Gillespie* and *State v. Dickey,* decided at this term (147 Md. 45), and need not be restated here. Nor in view of what we said in those cases is it necessary to refer further to the court's action on the demurrer to the indictment than to say that in our opinion it was properly overruled.

Of the other questions presented by the appeal the first in natural order is the propriety of the court's action on the suggestion and affidavit for removal. That suggestion was based upon the theory that since Gillespie and Dickey had been tried and convicted by three judges of the Supreme Bench of Baltimore City of the same crime with which Newton is charged in this case, that any jury in Baltimore City would inevitably be affected by that fact and that no jury could be empanelled in that circuit "which would have the courage to override the conclusions reached by these judges and determine the law and the fact of this case as by the Constitution of this State they are empowered to do." Evidence taken in connection with the suggestion showed that the opinion of the three judges who sat in the Gillespie and Dickey cases was published in the daily papers of Baltimore City. At the conclusion of that evidence the court overruled the suggestion for removal, and a judge who had not partici-

pated at the trial of Gillespie and Dickey was assigned to try the case.

That every one charged with a crime against the laws of this State has the absolute and unqualified right to have his case heard by a fair and impartial jury is not to be doubted, and that that right is one of the most valuable privileges guaranteed to the citizen by the constitution of this State is not to be questioned. That it would be denied by requiring such a person to submit his case to a jury which felt constrained to decide it in accordance with the judgment of some other tribunal or for any reason except what was found in the law and the facts of the case before them is just as clear. Such a procedure would be ghastly mockery of the law, for obviously no jury could be regarded as fair or impartial which, before it had heard the evidence, felt bound by the decision of some other tribunal to convict the defendant.

But we find no such condition in this case. If the traverser's contention is sound, then in nearly every case in which two or more persons are jointly indicted for the same joint offense, and where there is a severance for any reason, and one of the defendants has been tried and convicted, the untried case against the others must be removed as a matter of course, because all the judges and all persons eligible for jury service in that jurisdiction would be so much affected by the conviction in the first case that they would be unable to fairly and impartially try the other cases. Such a contention in our opinion goes too far. We do not think that the fact that two persons, jointly indicted with him for the same conspiracy, were convicted of that crime by three judges of the Supreme Bench of Baltimore City, compels the conclusion that the traverser in this case could not secure a fair and impartial jury in that city, and we could not, therefore, say that the trial court in overruling this suggestion abused the discretion reposed in it, for, aside from the fact that Gillespie and Dickey were so convicted by the three judges of the Supreme Bench of Baltimore City and such inference as might be drawn from that fact, there was no testimony

relating to the question at all.  We cannot assume as a mat-
ter of law, as we are asked to do, that either judges or jurors
will be influenced by considerations which under their official
oaths they are bound to disregard.  And the statements made
by the jurors in this case tend to confirm that view.  Those
statements were not, it is true, made in connection with the
suggestion, but nevertheless they illustrate the danger of ar-
bitrarily approving such a proposition as that embodied in
the defendant's contention.  Before he was sworn in this case
every juror on the panel expressly denied that he would be
influenced in rendering his verdict as to Newton by the
verdict of the three judges, and stated affirmatively that his
verdict would be based solely upon the law and the evidence
uninfluenced by the action of the three judges in the case
against Gillespie and Dickey.  The suggestion was addressed
to the sound judicial discretion of the trial court, and, in
the absence of anything in the record showing an abuse of
that discretion, we would not be justified in reversing that
court's action upon it (*Allers v. State,* 144 Md. 75), and it is
therefore affirmed.

This brings us to the questions presented in the exceptions
relating to the court's rulings on questions of evidence and to
certain remarks made by the judge who presided at the trial,
and by the State's Attorney in the presence of the jury dur-
ing the trial.

Before considering these exceptions in detail we will refer
briefly to the issues in the case material to the questions
raised by these exceptions.  Gillespie and Dickey had audited
the books of the Union Finance Company, and as a result of
their examination a letter signed "William A. Gillespie &
Company" was addressed to the Union Finance Company,
in which the writer stated:  "We find your company to be sol-
vent and capable of meeting all obligations and contracts en-
tered into with your clients.  We further certify that your
company purchases and sells listed securities in large volume,
and your inventory of securities at the market at the close of

business August 15, 1922, shows a substantial surplus over and above your obligations."

The State charged in the indictment that those statements were false, so that the issues were (1) was the Union Finance Company solvent and capable of meeting all obligations and contracts entered into with its clients? (2) did it buy and sell listed securities in large volume? and (3) did its inventory of securities "at the market" at close of business August 15th, 1922, show a substantial surplus over and above its obligations? There were, of course, other issues, such as the existence of an intent to cheat and defraud and whether there was a confederation as charged in the indictment, but those we have named were the controlling controverted issues in the case.

In connection with the first and third issues much of the testimony offered related to the value of the common stock of the California Oil Mining Corporation. It had been bought at twenty cents a share, but Gillespie and Dickey, relying upon a letter from the Prudential Securities Corporation offering fifty cents a share for it, valued it at that price. The State's theory was that that letter was a collusive device written for the purpose of giving a ficititious value to the stock, and that the stock had no such value.

James H. Harrington, an employee of Redmond & Company, brokers, testifying for the State, said that the trust had bought in all through that company listed securities amounting to $318,324.54, and it appeared from other witnesses that its equity in the unsold balance of those securities in the hands of Redmond & Company, with its other assets, was sufficient to cover the deposits made by customers of the trust which had not been withdrawn, amounting to $107,750, if the oil stock was really worth fifty cents a share, and the Jockey Club stock worth the price paid for it, and if money withdrawn by Newton from the fund amounting to $5,450.02 was properly treated as an account receivable due the trust, and if an item of $12,895.25 paid to solicitors as commissions for business was properly treated as organization ex-

pense and an asset. Harlan Johnson, an expert accountant, testifying for the State, said that on August 15th, valuing the oil stock at cost, the liabilities of the trust exceeded its assets by $21,955.67. But if that stock had appreciated thirty cents a share in value it would have been worth $41,-400 more than the valuation placed upon it by that witness. It is apparent, therefore, that the value of the oil stock was of vital importance to the defendant, because if it was actually worth the price at which it was valued in the Gillespie audit, the trust was solvent according to the audit of the State's own expert. The only testimony offered by the State as to the value of this stock was that of the witness Johnson referred to above, who in his audit placed it at cost because he had no idea what its value was, and who said that he could not learn it from the brokers he consulted, because it was an unlisted stock; that is, it was not listed on any stock exchange.

For the purpose of showing its value, the defendant attempted to prove by competent witnesses the nature of its business, the value of its property, the price at which its stock sold and the reasons why its stock could have been worth fifty cents a share on August 15th, and only twenty cents a share when purchased about a month before, in a series of questions which are involved in exceptions numbered fifty-one to fifty-nine, and sixty-four to seventy. Bernard Makeover, who appeared to be a responsible business man of Baltimore, after testifying that he was the president of the oil company, was asked to give its history, the nature of its business, the price at which it had disposed of its stock prior to August 15th, 1922, whether prior to that date any of its stock had been sold, whether on that date fifty cents a share was a fair valuation of its stock, whether he was familiar with its affairs, whether he had seen its property and whether it was a going concern. Robert V. White, a director of the oil company, owning 36,000 shares of its stock, after testifying that he had heard of a great many sales of its stock between June 16th and August 15th, was asked whether it was

worth fifty cents a share on August 15th, 1922; what changes took place in the oil company between June 16th and August 15th with which he was familiar, which could have affected the value of the stock, what additional money was put into the corporation, how much money to his knowledge had been expended up to August 15th in developing its business, and whether there was any difference between the value of the stock on June 16th and its value on August 15th. None of these questions was allowed, and while some of the information sought to be elicited by them was afterwards admitted, in our opinion there was injurious error in the rulings of the court as to the questions involved in several of these exceptions. Some of the questions were leading, and were for that reason objectionable, but others which the court refused to allow were in proper form and relevant to the issues in the case. Indeed, it is rather difficult to see upon what theory the objection to them was sustained.

The contention of the State appears to be that no evidence as to the value of the stock was relevant at all, because it was unlisted stock and *ipso facto* had no market, and that, having proved that it was unlisted, there arose an irrebuttable presumption that it had no value "at the market," because in the Gillespie letter the writer certified that the securities owned by the trust "at the market" exceeded its liabilities. But that position is untenable for several reasons: First, because it is charged in the indictment that the statement in the letter that the trust was solvent and capable of meeting all obligations entered into with its clients was false. Obviously the defendant was entitled to meet that charge, if he could, by showing that the market value of the trust's assets did enable it to meet those obligations. And if there was no such current open market for the oil stock forming part of its assets as there would be for a listed stock, it was permissible to resort to such evidence as would tend to show its actual value as reflecting upon its market value; second, because even in connection with the ascertainment of its value at the market it was permissible to show the nature and char-

acter of the property to which such value related, and that term did not as a matter of law carry the implication that the securities referred to were listed or that they had an immediate market, and third, the term "at the market" in the case of an unlisted stock did not necessarily mean that the market referred to meant the stock exchange market, or daily quotations, for it could not be assumed as a matter of law that because it was unlisted it had no market value, since property may have a market value though it is not fluid and cannot be instantly exchanged. The expression "at the market," as used in the letter, postulates two things, one that there is a market for the securities, and two, that in that market they had the value given them. Applied to an unlisted stock, in ordinary usage the term would naturally be understood to mean the price for which the stock could be sold through the exercise of reasonable diligence and within a reasonable time by an owner who desired but was not compelled to sell it. And when it is considered that in the certificates of deposit given the depositors they were notified that the money deposited by them was to be used for participation in "syndicates, pools etc.," it cannot be assumed as a matter of law that the words "your inventory of securities at the market exceeds your liabilities" as used in the letter was equivalent to saying "you have listed securities which at the market exceed your liabilities," or that they meant anything more than saying "the market value of your securities is in excess of your liabilities," and that is the construction given it by the State in its brief. And while the term "value at the market" carries the implication that there is a market, it does not necessarily mean an instant or immediate market in which that price may be had, but that the thing possesses such qualities that it may by the exercise of ordinary diligence be sold at that price. On the part of the State the only affirmative and direct testimony concerning the value of the oil stock was that of Mr. Johnson, who, after having said that he consulted two brokerage firms as to the value of the stock, summarized the result of his investigations as follows:

"In making the statement that the Union Finance Company was insolvent, I was governed entirely by the amount of the assets and the amount of the liabilities. I do not know what the California Oil Mining stock was worth on August 15th. I could not find the value, and I stated it at cost. Subject to the examination of the California Oil Mining stock and the Mexican Jockey Club stock it might very well be that the Union Finance Company was entirely solvent on August 15th." Under such circumstances it was permissible to show that the stock did have a market value, even though it was not a listed stock, through such testimony as that offered by the defendants and referred to in these exceptions.

In 22 *C. J.* 186 it is said: "Where corporate stock is not listed on any exchange and has no regular market value, evidence of the value of the assets of the corporation and its indebtedness, liabilities or insolvency is admissible to show the value of the stock; or such value may be determined by ascertaining the nature, amount and permanency of the business done by the corporation; the dividends paid, the control of the stock, the management, the market for articles sold, if the business is a commercial one, and other circumstances of like nature legitimately bearing upon the questions of value and income." These principles we think are generally recognized as sound and have been applied to an infinite variety of facts and circumstances. In *Jones on Evidence,* par. 169, it is said: "The market price of a commodity is a conclusion which is largely made up of presumptions, and may always be proved by the opinions of witnesses based of necessity, in part, at least, on hearsay. If there is no market, then the actual value may be proved, as for instance by what it is sold for in a bona fide transaction. Where an article in question has a market value, such value is usually taken as the actual value of such article. The proof of value is generally by the judgment or opinion of witnesses. If the article has no market value, its value may be shown by proof of such elements or facts affecting the question as may exist. Recourse may be had to the items of cost, and its utility and

use." And to the same effect is *Meyer v. State,* 137 Md. 491, Words and Phrases (2nd Series), "market value." It is said in *Milwaukee Trust Company v. Milwaukee,* 151 Wis. 224: "The word value stands as one of the most difficult and elusive mental concepts and the ascertainment of what is called 'market value' in a case there is no open market recording numerous transactions of sale or barter and responding automatically to the relative quantities of demand and supply, is still more difficult \*\*\* For these reasons in all inquiries relating to value, where there is no known regular and continuous market such as exists in the exchanges or such as exists generally for consumption of goods a wide range of investigation is permitted and the rules governing the admission of evidence are liberal. \* \* \*"

Applying these principles to the facts of this case, in our opinion the questions involved in exceptions fifty-one to fifty-eight, inclusive, and in the sixty-fifth and sixty-seventh exceptions should have been allowed. We find no error in the rulings as to the remaining questions involved in this series of exceptions because of their form.

Harlan Johnson, a public accountant on the staff of Haskins & Sells, produced on behalf of the State, testified that he had examined the books and papers of the Union Finance Company and Emory M. Newton, and gave in some detail the results of his examination of the books of account, stock, inventories, etc., but did not testify as to the terms of any contracts between the trust and its clients. He was then asked this question: "Tell the court and the jury whether the books of Newton, trading as The Union Finance Company, showed that company to be capable of meeting all obligations and contracts as of August 15th, 1922"? The witness was allowed, over objection, to answer this question and said: "I would say, no. The books of the Union Finance Company show that they were not capable of meeting their liabilities on August 15th. According to these books I found a difference or a loss of $21,955.69." This ruling is the subject of the twenty-seventh exception.

Allen O. Stehl, an accountant in 'Gillespie's employ, offered as a witness for the defendant, after testifying that he had examined the original audit and balance sheet, the working audit and the books on which they were based, and after testifying concerning various items in the audit, was asked: "Did you find in the making of that audit whether or not all of the receipts of Newton were properly and fairly accounted for on his books?" An objection to that question was sustained because it submitted a question of law to the witness, and we find no reversible error in that ruling, which is the subject of the seventy-second exception. But manifestly if the question asked Stehl was objectionable because it asked the witness' opinion on a matter of law, the question asked Johnson, which was allowed, was still more objectionable for that reason, for whereas the question asked Stehl only sought his opinion upon the correct practice in accountancy, that asked Johnson asked him to construe "all the obligations and contracts" of the trust. The only contract in evidence between the trust and its clients provided in part that.

"The Union Finance Company is to receive thirty per centum from this account and the said * * * to receive seventy per centum of monthly disbursements.

It is also understood that the said * * * can withdraw all or any part of * * * account upon sixty days' written notice to the Union Finance Company."

During the trial of the case it developed that different constructions had been placed upon that language. That of the State appeared to be that under it the trust was obliged to return upon demand to the depositor the amount of his deposit intact, and that is the theory upon which the accountants for the State and the defense acted in making up their audits. Newton on the other hand construed it to mean that he was only obliged to return to the depositor seventy per cent. of his deposit, and that the remaining thirty per cent. was to be retained for operating expenses including compensation to him. And there was a third possible theory. In the contract referred to the trust did not undertake to return

the whole deposit, but the "account." The trust had no existence aside from the deposits. Together they constituted a pool which was the "trust." Aside from them it had no resources or revenue except possible profits accruing from the manipulation of the deposits. If there were profits, naturally the expenses would be paid from them; if there were losses exceeding the profits and the trust was not entitled to retain thirty per cent. for operation, necessarily they with the expenses would fall on the depositors, in proportion to the amount of their respective deposits, and in that case, the "account" of such depositor would represent his entire deposit less his share of the losses and expenses incurred whilst it was a part of the pool. Which, if any, of these constructions was correct was a matter of law to be passed upon by the jury, who were, under the Constitution of this State, judges of the law as well as of the fact. The court itself could not have instructed the jury as to the construction of the contract without warning them that they were not bound to accept its construction, and *a fortiori* no witness was privileged to do so.

In *Wheeler v. State,* 42 Md. 563, the appellant had been convicted of keeping a gaming table. In the trial of that case the defendant asked a witness whether he "had any knowledge of the traverser keeping or having kept a gaming table, or of his keeping or having kept any room or place for gaming etc." An objection to the question was sustained, and in passing upon that ruling this Court said, speaking through Judge Miller: "To have answered the question as proposed to be asked it would have required of the witness to form a conclusion as to the matter of inquiry that the jury alone were competent to determine. He would have been obliged to respond to a question of law as well as of fact * * *. This he was incompetent to do * * *. He should have been asked simply his knowledge of fact pertinent to the issue joined, without being required to form an opinion respecting the very point which the jury were to determine." See also 22 *C. J.* p. 634. In this case the witness could have been

asked as to the amount of deposits as shown by the books, and in fact he was asked as to that, but to have asked him to say whether the books of the trust showed it to be capable of meeting all its "contracts and obligations" was to require him to respond to the very inquiry which the jury were sworn to answer. Nor can we doubt that this ruling was injurious, when it is considered that the conclusion of the witness was based upon his construction of the contract which in effect went to the guilt or innocence of the defendant.

William A. Gillespie, a witness for the appellant, was asked by the court if there were not a distinction between book profits and earned profits, and over objection made this answer: "Well a man could get a surplus in that way. Yes, sir. The report that Mr. Dickey showed me showed a surplus of $23,000, which would indicate that the company had some profits. As a matter of fact there were papers showing that they had made a profit." He was then asked "How much," and said: "It must have been this twenty-three thousand dollars." The court then said: "You know better than that, Mr. Gillespie." Objection was then made to that remark, and the following took place: "(By the court): Well, that is withdrawn, that comment." "(By Mr. Owens): But I still take exception to it and I object to that comment whether it has been withdrawn or not." "(By the court): I will withdraw the question then and the comment stands." This ruling is the subject of the forty-ninth exception.

The same witness in the course of his examination had said that he had treated notes due the trust as "securities." In his cross-examination he was asked by the State's Attorney: "Now at the trial of your own case, Mr. Gillespie, you did not at that time, did you, undertake to call these notes securities?" Counsel for the defendant in objecting to that question said: "Not only does he call notes securities but there are three decisions of the Court of Appeals, that decides that they can be called securities." The Court then said: "I would be very sorry to think that the Court of Appeals would make any such foolish decision as that, sir." That remark is the subject of the fiftieth exception.

These two exceptions cannot be considered without reference to the fact already adverted to, that in this State the jury are judges of the law as well as the fact in criminal cases, and that it is their exclusive province to pass upon the credibility of witnesses who testify to facts relating to issues in any trial before them, and that the right to trial by jury is regarded as an actual and substantial privilege. The practice in some jurisdictions is different, and the federal courts have come to sanction what in many of the states would be regarded as tantamount to a directed verdict in criminal cases, and in such jurisdictions it may be said that the court does pass upon the credibility of witnesses. The case of *Horning v. District of Columbia,* 254 U. S. 135, illustrates that view. There the court, in charging the jury in a criminal case, said: "Of course gentlemen, I cannot tell you in so many words to find the defendant guilty, but what I say amounts to that." The court, after stating that the facts were undisputed, said in part in considering that charge: "Perhaps there was a regrettable peremptoriness of tone—but the jury were allowed the technical right, if it can be called so, to decide against the law and the facts. * * * If the defendant suffered any wrong, it was purely formal, since as we have said, on the facts admitted, there was no doubt of his guilt." That however is not the law in this State. Article 15, section 5, Md. Const., and cases cited volume 3, *Bagby's Code Pub. Gen. Laws of Md.; Deems v. State,* 127 Md. 627.

The remark involved in the forty-ninth exception was equivalent to a statement by the court that the witness Gillespie had testified to what he knew to be untrue, and was a direct reflection upon his credibility. That such is its effect is admitted by the State in its brief, where this frank but singular statement is found: "The answers of the witness to this question were clearly evasive and certainly merited the comment of the court. Inasmuch as the only effect a comment could have had was to affect the credibility of the witness before the jury and did not of itself cast any reflection upon the traverser, certainly the traverser was not prejudiced

thereby." Inasmuch as the traverser's case depended upon the credibility of his witnesses, it is not easy to see how any-thing could possibly prejudice him more than a conclusion that their testimony was not credible, and there was in our opinion error in this ruling.

There was also prejudicial error in the ruling involved in the fiftieth exception. The term "securities" includes "evidence of indebtedness" (35 *Cyc.* 1238), and embraces bills of exchange, bonds for the payment of money and promissory notes (*Ibid,* note 59; *Wagner v. Scherer,* 89 App. Div. 202, 85 N. Y. Suppl. 894; *Duncan v. Md. Sav. Inst.,* 10 Gill & J. 308), and the statement by the court that promissory notes, which the witness in his audit and in his testimony had treated as "securities," could not as a matter of law be so considered, was erroneous, and to have made that statement in the presence of the jury was, we think, injurious error. If as a matter of law they could not be so treated, it followed that in that respect at least the audit was false. And, while not addressed to the jury, the remark was made in their hearing, and, because of the wholly disinterested and im-partial position occupied by the judge, was more likely to influence their judgment than if it had come from any other source, and while we have no doubt that it was an inadvert-ence, its effect was prejudicial. *Coffin v. Brown,* 94 Md. 203.

Herman J. W. Weiskopf, the first witness offered for the State, produced a number of letters "obtained by counsel for the State from the trustee in bankruptcy of Emory M. New-ton," which were, without further authentication than what may be inferred from that fact, offered in evidence, and ad-mitted over objection. That ruling is the subject of the fourth exception. Some of these letters were between Newton and William A. Gillespie, some between Gillespie and Edward J. McCall, some between Gillespie and the Archbald Con-solidated Coal Company, and some were not signed at all. Except for the fact that they had been obtained from New-ton's trustee in bankruptcy, there was no authentication of

the letters.   It did not appear where the trustee got them, nor was there any proof as to the signatures to them, where there were signatures at all.   All of them were written more than a year before the alleged conspiracy, and none of them contained any reference to it.   The trustee did testify that he secured "books and papers" of the Union Finance Company and Newton, but he said nothing to indicate that the letters offered in evidence were among the "books and papers" which he received, or that they were found in the possession of Newton, and in fact he was not asked and did not testify as to the letters at all.   This was not in our opinion a sufficient authentication.   *People v. Manganaro,* 218 N. Y. 9. Aside from the question of authentication, several of these letters were entirely irrelevant.   For, while letters between Newton and Gillespie may have been relevant to show their relationship, letters between Gillespie and persons other than Newton, having no reference to the alleged conspiracy, certainly were not, and as they were all offered together there was also for that reason error in overruling the objection to them.

The thirty-seventh and thirty-eighth exceptions relate to the action of the court in permitting certain questions to be asked in the cross-examination of Harold R. Dickey, Jr., a witness for the defense.   After having testified at some length as to the preparation of the Gillespie audit and the result of his examination of the resources and liabilities of the trust, he was asked:   "You testified concerning these transactions in the case of the State against Dickey, and the State against Gillespie, giving then the same explanations that you have given us here, did you not?"   He was directed over objection to answer that question, and the following colloquy took place:   "Well, I can't remember exactly all that I said in the last case.   Q. Now, don't split hairs with me.   Did you testify in this same way in the trial of your own case?   A. I can't remember all of those things, Mr. Leach.   Q. Didn't you make substantially the same explanation then that you are making here now today?   By Mr. Owens:   We are noting

an objection and exception to all this. The Court: Yes.
Q. (Question by Mr. Leach): In your own trial? A.
Practically. Q. And you were convicted, were you not?
Q. (Question by Mr. Leach): Go on and answer me? You
were convicted in your trial before Judge Gorter and Judge
Bond and Judge Stanton, were you not?" In answer to the
last question the witness replied that he had been so convicted.
This method of cross-examining the witness was in our opin-
ion highly objectionable. If the purpose of the examiner was
to impeach the credibility of the witness by showing that he
had been convicted of crime, he should have asked him that
question directly (40 *Cyc.* 2607), or if he had intended to
show that he had in some other case sworn to statements con-
trary to his testimony in the instant case, he could have been
asked whether he had made such conflicting statements. But
these questions had no such object. In addition to intimi-
dating the witness, their only apparent purpose was to bring
to the attention of the jury the fact that he had made in his
own case, when he was tried for the same crime, not a differ-
ent but the same statement as that to which he testified in
this case, and that the three judges before whom he was tried
discredited that statement and convicted him. The obvious
purpose was to induce the jury to believe that, as the testi-
mony of the witness as given before them had already been
discredited by three judges sitting in the same court in an-
other case, that, therefore, they should discredit it in this
case, a wholly unwarranted conclusion unsupported by any
authority with which we are familiar.

The third and fifth exceptions relate to the action of the
court in allowing the State to prove that an involuntary pe-
tition in bankruptcy had been filed against Newton on May
23rd, 1922, in the United States District Court in Baltimore.
In our judgment that evidence was relevant as reflecting
upon Newton's financial condition shortly before the alleged
conspiracy, and we find no error in those rulings.

The seventh, eighth, twelfth, thirteenth, fourteenth,
fifteenth, thirty-fourth, thirty-fifth, thirty-sixth, fortieth,

forty-third, forth-fourth and seventy-fifth exceptions relate to
the action of the court in permitting the State to introduce in
evidence, over the defendant's objection, evidence to show the
publication in the daily newspapers of Baltimore City of the
article referred to as the "Griswold challenge," and that it
had been brought to Newton's attention. This testimony was,
we think, relevant and properly admitted. The question was
not whether Newton was obliged to accept the so-called chal-
lenge, and submit his books to an auditor for examination
selected by some one other than himself, but whether the re-
flection cast upon the business in which he was engaged, by
the article or by his refusal to accept the challenge, supplied
a motive or reason for the alleged conspiracy. And while we
do not mean to say that such an inference should be drawn
from those facts, nevertheless it could be drawn from them,
and the evidence was, therefore, material and relevant.

The court permitted Harlan Johnson, an expert account-
ant, to give over the defendant's objection, the result of his
examination of the books of account of the Union Finance
Company, and its action in admitting that evidence is the
subject of exceptions numbered seventeen to twenty-four.
We find no error in those rulings. The books were in evi-
dence and the testimony of the witness amounted to no more
than a summary of their contents, given to aid the court and
jury in securing a correct understanding of the entries in
them. It would be exceedingly difficult and inconvenient,
if not impracticable, for a jury without special training or
knowledge to form any sound or intelligent conclusion from
an examination of the voluminous and complicated entries
and accounts often found in such books without such assist-
ance, and, where the books which are the basis of the testi-
mony are in court and properly proved, such a practice is gen-
erally approved. 16 *C. J.* 615; *Blum v. State,* 94 Md. 387.

In the examination of the witness Dickey, offered on be-
half of the defendant, reference was made to "the audit," and
counsel for the defendant announced that he would offer it
in evidence. "The audit" was presumably the Gillespie au-

dit, upon which the letter referred to in the indictment was based. The State's attorney stated that he would object to it unless it were shown that Newton knew its contents, and in the course of his remarks to the court said "that letter is one tissue of misstatements. One right after another," and then read the letter to the court. The following then occurred: "By the court: Now, you say that the first is a misstatement; that he made an audit of the books? By Mr. Leach: That is a misstatement, technically. By the Court: Now, that is the State's point of view, but still can't this traverser show that they did make an audit? By Mr. Leach: No. sir, because I have tried this very traverser and heard him swear that he did not." That these remarks on the part of the State's attorney were exceedingly improper and calculated to unfairly prejudice the jury against the defendant, is scarcely a matter for argument, and the court should have warned the jury to disregard them. But as the remarks were upon motion stricken out, and as the traverser at the time asked for no other action on the part of the court, we do not regard its failure to so warn the jury as reversible error.

William A. Gillespie, testifying for the defendant, said that he had been influenced in valuing the oil stock at fifty cents a share by a letter of the Prudential Securities Corporation; that he knew Pruden and thought the offer all right, and from a "concern that was well able to take it up." After a colloquy between the court, the witness and the State's attorney, he was asked by counsel for the traverser: "What made you think, what was the special thing, if it was a special thing, operating on your mind that made you think that the Prudential Securities Corporation offer was a good offer?" The State objected and the court, ruling on the objection, said: "I will not let him make an answer if he is going to refer to Pruden, unless he will say that he was under the impression that Mr. Pruden made the offer and will give that as his reason. In that case that will be all right." The limitations imposed upon the witness by this ruling, which is the subject of the twenty-ninth exception, were too

narrow. He could not well have answered the question without referring to Pruden, who signed the letter for the corporation as its president, and yet, if he knew of any circumstances which affected the value of the offer, he should have been permitted to state it, although manifestly he could not justify his faith in the offer of the corporation by showing the responsibility of Pruden. But as the question itself was bad in form, we find no reversible error in the ruling.

During the cross-examination of the defendant the State was permitted over objection to offer in evidence section eight of the deed of trust under which the Union Finance Company, Common Law Trust, claimed to operate. Afterwards the defense offered in evidence the whole document, but on motion it was excluded. These rulings are the subject of the seventy-third, eightieth, eighty-first and eighty-second exceptions. The paper was not recorded. There was nothing to show that it had been brought to the attention of any actual or prospective *cestuis que trust,* by publication or otherwise, and it would not ordinarily have been admissible, but inasmuch as the court had over the defendant's objection admitted part of it, the defendant was entitled to have the entire instrument in evidence, and there was error in excluding it.

The remaining exceptions are not in our opinion of sufficient weight to justify a detailed discussion, and it is sufficient to say that after a careful examination of them we have discovered no reversible error.

Because of the errors indicated above, it follows that the judgment appealed from must be reversed and the case remanded for a new trial.

> *Judgment reversed and case remanded for a*
> *new trial.*

PARKE, J., dissents.