PIRACCI ET AL. *v.* STATE
(Two Appeals in Separate Records)
[Nos. 162-163, October Term, 1954.]

500

502

*Decided June 22, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*G. C. A. Anderson,* with whom were *James S. Morrow, Jr.,* and *Anderson, Barnes & Coe* on the brief, for the appellant in the conspiracy to obstruct justice case.

*G. C. A. Anderson* and *James S. Morrow, Jr.,* with whom were *Anderson, Barnes & Coe* on the brief, for the appellants in the conspiracy to defraud case.

*Norman P. Ramsey, Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Anselm Sodaro, State's Attorney for Baltimore City,* and *J. Harold Grady, Deputy State's Attorney,* on the brief, for the appellee in both cases (argued separately).

HENDERSON, J., delivered the opinion of the Court.

These appeals are from judgments and sentences in each case of a year in jail for Piracci, to run consecutively, suspended upon payment of a fine of $2,000 and costs in each case.

These cases arose out of alleged irregularities in connection with the authorization and construction of a parking garage at Hanover and Redwood Streets, in Baltimore City, one of the projects mentioned in *Jones v. State,* 207 Md. 481, just decided. In No. 162, Piracci was charged in two counts with conspiring with one Ashley and others, to obstruct justice by altering and falsifying certain records of the Piracci Construction Co., Inc., for portions of the years 1951, 1952 and 1953, which he had been summoned to produce before the Grand Jury. In No. 163, Piracci and Piracci Construction Co., Inc. were charged in three counts with conspiring with Haar, Winik and Baltimore Garages, Inc., to fraudulently obtain from the City $42,966 "by means of divers false pretenses and representations, and other false, subtle means and devices". In both cases the appellants elected a jury trial, but in No. 163, the defendants other than Piracci and Piracci Construction Co., Inc., elected a court trial, and there was a severance. In each of the instant cases the appellants filed a petition for removal, which was denied. The correctness of that ruling is the only question argued in No. 162, and the brief in that case combines argument on

the point with argument on the similar point raised in No. 163.

Presentments in both cases were returned on October 21, 1953, and indictments were filed on October 30, 1953. Motions to dismiss both indictments were filed on December 18, 1953, on the ground, among others, that an undue amount of publicity had been given the Grand Jury proceedings, resulting in undue pressure and influence upon the Grand Jurors and in a violation of the rule of secrecy. In overruling these motions on January 19, 1954, the trial judge considered exhibits that summarized the publicity up to that date. A trial schedule was then arranged. The case against Haar, Winik and Baltimore Garages, Inc. was heard by the court and concluded on March 18, 1954, with a verdict of guilty. The trial of Piracci and Piracci Construction Co., Inc., No. 163, began on March 19. A petition for removal was filed on that date. The case resulted in a verdict of guilty on April 1. The trial of Piracci on the obstruction of justice charge, No. 162, began on April 5, and a petition for removal was filed on that date.

The petition for removal in No. 163 alleged that a public controversy over the Rivoli Theater project, in which Piracci was concerned, had begun in June, 1953, developed into a Grand Jury investigation, and culminated in a number of indictments, all of which had been extensively publicized, almost daily over a period of nine months, with comments "suggestive, if not accusative, of improper or unlawful dealings in connection with the said Off-Street Parking Program". It was further alleged that the verdict of guilty in the case against Haar and Winik had been announced on the previous day, accompanied by an oral opinion reviewing the evidence in some detail and determining that these defendants had conspired to defraud the City; "that the conclusions to be drawn by the public and prospective Jurors in these circumstances are necessarily and inescapably harmful and prejudicial to these Petitioners". The State did not file any specific pleading traversing the allega-

tions, but expressed its opposition to the removal and counsel were heard in argument. The court declined to postpone the hearing, as requested, to enable the petitioners to prepare exhibits covering newspaper clippings over the previous nine months. The court said: "it is clear that until yesterday no petition was filed and counsel did not regard the factors that were to be considered as sufficient grounds to justify them in praying for removal. The change which has taken place by reason of yesterday's proceedings does not seem to us to be sufficient to make this petition reasonable or not unreasonable. We feel that the [decision of the] Court of Appeals in the *Newton* case which has been cited is very close to the point here, and our decision follows that."

The petition in No. 162 alleged that the publicity concerning the convictions in No. 163, and the previous case against Haar and Winik, made it impossible for the petitioners to obtain a fair trial. Again, there was no answer filed by the State, but the court heard argument and examined the exhibits submitted. However, the petition in this case, as in No. 163, was not filed until the case was actually called for trial. We do not suggest that the petitions were not timely, but the lateness of their filing explains the State's failure to file formal pleadings.

Except in capital cases, the right of removal is not absolute, but is controlled by Art. IV, Sec. 8 of the Maryland Constitution as amended by Ch. 364, Acts of 1874, ratified in November, 1875. This section provides that in addition to a suggestion that the accused cannot have a fair and impartial trial in the court in which the case is pending, "it shall be necessary for the party making such suggestion to make it satisfactorily appear to the Court that such suggestion is true, or that there is reasonable ground for the same; * * *." We may assume, without deciding, that in a proper case the court might properly grant a removal upon a finding that there was reasonable ground for the suggestion, even if the court

did not believe that the petition established beyond question that a fair and impartial trial could not be had. Cf. *Lee v. State,* 161 Md. 430, 442. But in either case the burden of persuasion is upon the party making the suggestion. Here the trial court, assuming the truth of the facts alleged as distinguished from the conclusions to be drawn therefrom, found that there was not reasonable ground for the suggestion.

The appellants contend that this is a factual issue, not addressed to the discretion of the trial court. The argument runs counter to the holdings in a long line of Maryland cases. In the leading case of *Downs v. State,* 111 Md. 241, 248, the court said: "As it is now necessary to make it satisfactorily *appear to the Court in which the suggestion is made* that the party charged in the presentment or indictment is entitled to the order for removal, and as no other tribunal can determine when it *does so appear to that Court,* it follows as a logical conclusion that in the absence of evidence to show that the Court below acted arbitrarily and abused or refused to exercise the discretion given it by the amendment, this Court cannot say that the removal should or should not have been granted, and can only affirm the action of the lower Court." See also *Tidewater Port. Cement Co. v. State,* 122 Md. 96, 100; *Allers v. State,* 144 Md. 75, 78; *Newton v. State,* 147 Md. 71, 77; *Lee v. State, supra,* 433; *Jones v. State,* 185 Md. 481, 485; *Auchincloss v. State,* 200 Md. 310, 314; *Larch v. State,* 201 Md. 52, 55; *Heslop v. State,* 202 Md. 123, 126; *Wanzer v. State,* 202 Md. 601, 607. We adhere to the views expressed in these cases, which recognize, of course, that the action of the trial court is reviewable to determine whether there has been an abuse of discretion.

The appellants stress the fact that the State did not file any pleading in reply to the petitions for removal, citing *Jones v. State, supra* (185 Md. 481). In that case it was stated that the court could not ignore or summarily dismiss a petition for removal, and that in the absence of an answer its allegations must be taken as

true. . The case was remanded in order that the State might traverse the facts alleged in the petition and the court determine the truth or falsity of the allegations. It may be noted, however, that the allegations of the petition in that case, as in *Lee v. State, supra,* related to mob actions and racial prejudice, and were not confined to publicity, as such. We are not prepared to hold that the State's failure to reply in the instant case, if a procedural error, was a reversible one. The State did not contest the fact that the publications had been made as represented, but argued that the situation did not call for the action requested. Nor are we prepared to hold that the court's refusal to postpone the case, to permit the assembly of clippings covering the publications over the previous nine months, was an abuse of discretion under the circumstances. Matters of continuance are ordinarily within the discretion of the trial judge. Cf. *Laque v. State,* 207 Md. 242. It does not appear that the court was not aware of, or failed to give consideration to, the nature and extent of the newspaper comments. The court had previously considered exhibits covering the period up to January 19, 1954, and a sampling of the clippings in the record indicates that the publicity reached its peak with an announcement on October 22, 1953, of a "Fraud Conspiracy is Charged to Piracci."

The petition in No. 163 was based primarily on the announcement of the verdict in the Haar and Winik case on the previous day. The petition did not allege that that verdict or the opinion filed, had been falsely represented, but merely that the verdict and findings "have been and will continue to be reported and headlined in the widely circulated newspapers of this City". Of course, the court was aware of its own announced verdict and findings. It based its refusal on the case of *Newton v. State, supra.* As was said in that case (p. 76) : "If the traverser's contention is sound, then in nearly every case in which two or more persons are jointly indicted for the same joint offense, and where there is a sever-

ance for any reason, and one of the defendants has been tried and convicted, the untried case against the others must be removed as a matter of course, because all the judges and all persons eligible for jury service in that jurisdiction would be so much affected by the conviction in the first case that they would be unable to fairly and impartially try the other cases. Such a contention in our opinion goes too far." It was held that there was no abuse of discretion under the circumstances. To the same effect, see *Lockhart v. State*, 145 Md. 602, 612.

We find no abuse of discretion in denying the petitions for removal in the instant case. The publicity here was of a less sensational character than that set out in *Baltimore Radio Show, Inc. v. State*, 193 Md. 300, 308, *et seq.* What was said in *Downs v. State, supra* (p. 250), is apposite here: "We have examined these clippings from the newspapers and do not find in them *conclusive evidence* of the existence of such an intense public prejudice against the accused as would enable this Court to say that the Court below abused the discretion given it in refusing to grant a removal of the case. They do show that great publicity was given to the appellant's supposed connection with the larceny of the City's money, but it does not *necessarily* follow that by reason thereof there existed such a prejudice against the accused as to render it impossible for him to secure a fair and impartial trial in Baltimore City. Crimes of the nature of the one with which the appellant is charged naturally give rise to much newspaper and other comment, but such comment does not always arouse such a general prejudice against the accused as to render it impossible for him to secure a fair trial * * *." In *Grammer v. State*, 203 Md. 200, 209, it was said: "We think the appellant attributes to the undoubtedly very extensive public knowledge of and interest in the case and its component facts a prejudice which can neither be shown nor fairly and reasonably be assumed to have existed. * * * The newspaper accounts give no hint of anger, of hatred, or of intense resentment in the community,

such as exists when a child or woman is atrociously
molested or raped, or there has been a series of such
incidents or there is a racial element which has aroused
abiding prejudice or passion in the public." In the in-
stant case the publicity indicated a continuing public
interest in an alleged crime affecting the public funds
and the development of off-street parking facilities. But
each juror who served was closely questioned on the *voir
dire* concerning the publicity given the case and declared
that it would not affect his verdict, a fact which was
stressed in *Newton v. State, supra.*

In No. 163, the appellants contend that the court erred
in overruling the motion to dismiss the indictment. The
only contention here pressed relates to the conduct of
Hyman Pressman, who appeared before the Grand Jury,
and the conduct of certain newspaper reporters who are
alleged to have invaded the privacy of the Grand Jury.
As we have noted, the presentment was returned by the
Grand Jury on October 21, 1953, and the indictment fol-
lowed on October 30. On or about October 26, 1953,
Pressman, a lawyer who had been active in charging
irregularities in the off-street parking projects, and had
filed certain civil suits in connection therewith, made pub-
lic demand to appear before the Grand Jury, by a letter
and telegram to that body and by letters addressed to
the City calling for an appropriation to finance a further
investigation, which were published in the press. The
Grand Jury invited him to appear, and he did so. In sup-
port of the motion to dismiss, the appellants made a
proffer to prove these facts, which the court overruled.
In denying the motion the court said: "The letter and
telegram do not indicate that he [Pressman] was going
to address the Grand Jury or express views about matters
on which presentments had already been filed, but I
think it is fair to the defendants to assume that in view
of his previous activities he would not be sparing in
expressing his views on those indictments too. Does that
invalidate them? It is perfectly clear that he was invited
by the Grand Jury to appear as the result of his letter,

and that the Grand Jury had the right to hear him or refuse to hear him. It is also clear that a private person has a right to address the Grand Jury, and that the Grand Jury may act at the instance of a private prosecutor."

Since the court assumed the truth of the facts, as distinguished from the conclusions of law, alleged in the motion and the proffer in support of the motion, we find no error in the rejection of the proffer. The appellants urge that Pressman's conduct, as set out in the motion and proffer, was such an interference with the Grand Jury procedure as to invalidate the indictment. We do not agree. The appellants rely strongly upon *Coblentz v. State,* 164 Md. 558. There an attorney who was representing plaintiffs in civil litigation against a bank, was present as a "special assistant counsel for the State" during the entire presentation to a grand jury of the matter of the possible criminal consequences of the actions of the bank's officers. He was not there as a witness, but was present while others testified. It was held that he had no right to be present, in his capacity of special assistant counsel for the State, and hence his unlawful presence violated the rule of secrecy in Grand Jury proceedings, from which outsiders must be excluded, even though it is not shown that through their presence they exerted, or attempted to exert, pressure upon that body. But the case is readily distinguishable. Pressman was not present during the testimony of other witnesses. He was invited to appear after the presentment had been filed, and the Grand Jury had charged the appellants with specific acts amounting, in its judgment, to a violation of the criminal law. Except for the subsequent indorsement of "A True Bill" upon the indictment prepared by the State's Attorney, the Grand Jury had completed its action on the case. *In re Report of Grand Jury,* 152 Md. 616, 622. Presumably the Grand Jury wanted to learn what Pressman knew about other claimed irregularities in connection with off-street parking. But if we assume that he was interrogated about the pending case, it does not follow that this was a viola-

tion of the rule of secrecy. In *Brack v. Wells,* 184 Md. 86, it was held that any citizen who claims to have knowledge tending to show the commission of crimes has a right to ask permission to appear before the Grand Jury. In the instant case permission was granted. It is true that in the *Brack* case it was stated that the citizen should first exhaust his remedy before the magistrate and State's Attorney, as was done in that case, but the amplification of the opinion on that point was made because of the representation of the Attorney General that an unlimited right of recourse might interfere with the orderly administration of justice, not because of any doubt as to the right of the Grand Jury to interrogate whom it pleased.

The appellants rely upon the case of *People v. Parker,* 374 Ill. 524, 30 N. E. 2d 11, *cert. den.* 313 U. S. 560, holding that a citizen attempting to communicate with the Grand Jury is in contempt, where he has not first imparted his information to the State's Attorney, and, if that official refuses to act, made a complaint before a magistrate. This case was distinguished in *Brack v. Wells, supra,* and criticism of the case was cited. In the instant case, prior to the hearing of the motion to dismiss, Pressman had been held not in contempt by the same trial judge who heard the motion. But even if we assume, without deciding, that Pressman's previous conduct was contemptuous, it would not follow that the Grand Jury was precluded from inviting him to appear, in the exercise of its common law inquisitory and investigatory powers. Cf. *Brack v. Wells, supra* (pp. 93, 96).

In regard to the conduct of newspaper reporters, the motion alleged that they stationed themselves in the ante-room and observed and identified all persons who entered or left, publicized the appearance and departure of many, and reported the time witnesses spent in the room. It was not alleged that any reporter entered the Grand Jury room, or eavesdropped upon its proceedings or deliberations. We find no merit in the suggestion that their conduct constituted a "constructive presence" in

the Grand Jury room. Close coverage of a case of public interest is not enough to vitiate an indictment, even if persisted in to the point of contempt. It may be that the reporters could have been excluded from the court house precincts if their conduct interfered with the orderly exercise of the Grand Jury's function, but here there is no evidence that such an order was passed or sought. The appellants made a proffer of testimony by certain reporters that they were sometimes informed, by persons undisclosed, of happenings within the room and of the persons who were to be presented before presentments were filed. We find no error in the denial of the proffer. As the trial court indicated, the fact that some persons may have talked too freely, and even laid themselves open to contempt proceedings, would not vitiate the indictment. As we have indicated, the rule of secrecy is designed to protect the jury from outside interference or pressure, not to guarantee against unauthorized disclosure of a presentment or the charges on which it is based. Cf. *Commonwealth v. Kirk,* 17 A. 2d 195 (Pa.), and *Howard v. State,* 4 S. E. 2d 418 (Ga.). Moreover, the proffer was too general in its terms, and might well have led to further and still more improper disclosures. It is generally held that an indictment returned by a Grand Jury is unimpeachable. *Bernard v. Warden, House of Cor.,* 187 Md. 273, 280.

Coming then to the merits of the case, the appellants contend that there was no evidence legally sufficient to support the verdict. The point was preserved by a prayer for directed verdict at the close of the case. It is important to bear in mind that the offense charged was conspiracy to defraud the City. The nature of the crime of conspiracy was fully discussed in the recent case of *Hurwitz v. State,* 200 Md. 578, 583, *et seq.,* where the Maryland cases beginning with *State v. Buchanan,* 5 H. & J. 317, were carefully reviewed. It was noted that the crime is complete in the conspiracy without any overt act, and that a criminal conspiracy may consist of a conspiracy to do things which are not themselves criminal

if done by one person. The indictment need state only the conspiracy and the object of it; the means by which it was intended to be accomplished are only matters of evidence to prove the charge. Of course, conspiracy may be shown by circumstantial evidence permitting the inference of a common design. *Lawrence v. The State,* 103 Md. 17, 21.

The bill of particulars furnished by the State did not become a part of the indictment. *Willis v. State,* 205 Md. 118, 126. We may note, however, that the State detailed and relied upon a course of conduct beginning in August, 1950, and referred specifically to the loan contract of January, 1951, to the supplemental contract for extra work of June, 1951, to the advancement by Piracci of installments payable by Haar and Winik to the City, and to an alleged inflation by Piracci of the cost of construction sufficient to supply to Haar and Winik the 15% of the cost they were expected to contribute along with the 85% furnished by the City.

The evidence showed, or tended to show, the following facts: Haar, Winik and Piracci had all been actively engaged in the development of off-street parking facilities prior to this venture. When Haar and Winik conceived the idea of this project, Piracci obtained for them the services of an architect to design the building and supplied preliminary sketches. An application proposing the project was submitted to the Off-Street Parking Commission on August 10, 1950. After this was initially approved, Haar and Winik negotiated for a loan agreement, and formed the corporation Baltimore Garages, Inc. of which they were the stockholders and principal officers. Piracci did business through a wholly owned corporation, Piracci Construction Co., Inc. For present purposes we will treat the individuals as the real parties in interest.

Piracci's estimator, Maskol, testified that in December, 1950, he estimated the cost of the building to be $197,636, including overhead and profit to Piracci of 10%. On the project application submitted, the esti-

mated building cost had been $236,000. Mr. Finck, a civil engineer employed by the Commission, noted in his own handwriting upon this application a figure of $197,-000 as a rough estimate. On January 12, 1951, a loan contract was approved by the Commission, although the Commission did not have final plans or specifications, or any contract between the operator and the builder. But it did have a letter from the Assistant City Solicitor pointing out that the loan contract provided that advances, not in excess of $167,450, would be in accordance with a schedule to be later approved by the Commission for construction according to the plans and specifications as finally approved by the Commission. He stated that the sum specified represented 85% of the estimated cost of $197,000. The loan contract was approved by the Board of Estimates on January 17, 1951, at which time the Board was informed by the Assistant City Solicitor that he was advised by the Commission that plans had been finally approved by the Commission and that the operator had entered into a contract for the construction of improvements in accordance with those plans. The loan contract specifically provided that advances to the operator should not, in any event, exceed in the aggregate the sum of $167,450, representing 85% of the contract price.

On January 12, 1951, Baltimore Garages, Inc. executed a contract with Piracci Construction Co., Inc., expressly subject to the approval of the Commission, whereby the latter undertook to erect the building for the fixed sum of $197,636. This was on a standard AIA form with certain special provisions. It included provisions for completion and other bonds. A copy was delivered to Finck. But on the same day, Haar, Winik and Piracci executed a "supplemental agreement" whereby Piracci agreed to erect the building upon a cost plus basis. It was stated that the contract previously signed was "a budget estimate * * * prepared by us * * * for the sole purpose of your expediting the loan for the construction of the aforementioned Garage". It was agreed that "this

project is to be constructed on a time and material basis, plus a fixed fee in the amount of $20,000 which amount will constitute our overhead and profit. * * * All savings (if any) which might be realized by us in the letting of all sub-contracts; in the purchase of materials; in labor; and etc., will be paid back by us to Baltimore Garages, Inc."

To understand the exact import of this "supplemental agreement", it is necessary to consider the nature of the Off-Street Parking Program, which was authorized by Ch. 28, Acts of 1948 (Sp. Sess.) and implemented by Ordinance 506 (1948). The enabling act authorized the City to issue bonds, the proceeds of which might be used to develop off-street parking facilities, and the Ordinance created the Commission to administer and supervise the expenditure of these funds. The Commission formulated a policy of private ownership under which off-street parking facilities would be erected by individual operators, the City lending 85% of the combined cost of the land and buildings of any project, and the operator advancing the balance of 15%. If a particular project was recommended by the Commission and a proposed loan contract recommended by it, the loan contract was then submitted for approval by the Board of Finance and the Board of Estimates. Under the enabling act this was the final step that would bind the City. It was also the policy of the Commission to require the operator to put up his 15% in advance. Thereafter, the Commission would approve progress payments by the City on the basis of requisitions submitted to it by the builder, up to but not exceeding the total amount specified in the loan contract.

It is clear that the supplemental agreement containing the so-called "kickback" or "rebate" provision was a material alteration of the building contract which had just been executed. The appellants argue that the Commission did not rely on it, because it had not seen it when the loan contract was approved. This argument overlooks the fact that the Board of Estimates was the

body that had the final say, and it can be inferred that that body relied upon representations that the contract in the standard AIA form was then in effect. It is implicit in the circumstances that neither the Board nor the Commission would, or could, bind the City to a loan in the absence of a binding building contract. Moreover, there was testimony that no City official was informed of the change and the Chairman of the Commission testified that he would not have approved the loan contract had he known of the change in the building contract.

Piracci began work on the project in April, 1951. On April 24, 1951, before any requisitions had been submitted, he was asked by Haar and Winik for a $20,000 loan, which he declined to make. However, he agreed to advance them 15% of each requisition which would be returned to him when the requisition was paid, if the City would waive its requirement of lump sum payment of the operator's share in advance. Application was then made to the Commission by Haar and Winik to pay their 15% in installments. The effect of this arrangement was that Piracci would supply the funds that the operator was obligated to advance, and receive them back from the City as each requisition was paid. In the light of the so-called "kickback" agreement, Piracci was now agreeing to rebate the anticipated savings on the building contract in installments, before it was finally determined what those savings might be. Here again, the Commission was not informed of the arrangement, although there was testimony that had it been informed, it would at least have occasioned an inquiry and might have caused the Commission to refuse the application. Piracci was called before the Commission on May 1, 1951, and informed of the application. He did not disclose that he knew all about it, or had agreed to advance the installments. He made no comment except to say that he would complete the job in any event.

In June, 1951, there was a proposal to add another story to the parking facility. Piracci submitted an estimated cost of $68,000 and overhead and profit of $16,749.

The last item could only inure to the benefit of Haar and Winik, in the form of a rebate, but he did not disclose this to the Commission. By supplemental agreement the City agreed to advance 85% of the extra cost.

When the building was completed in March, 1952, it was shown that Piracci had billed the City for a total of $294,207.10. The cost as shown on Piracci's books was $273,508.89, leaving a profit of $20,689.21. Included in cost, however, and carried in a column "loans or refund on contract" (formerly included under the head of "material") was the item of $41,235.47 which was rebated to Haar and Winik. The profit on the job was actually about $60,000.

The appellants argue that the Commission was not concerned at any time with the extent of Piracci's profit or what he did with it. They contend that the Commission, from the beginning and throughout the transaction, relied solely upon Finck's estimate of probable cost. Finck testified, however, that "when the Commission abolished the policy of competitive bidding it placed upon the operator the responsibility to submit to the Commission what would be a fair and equitable price for a structure. My estimate is purely a rough estimate. I have no facilities for making detailed estimates, so I have consequently got to figure on a rough basis. On this basis I figured there were ten thousand six hundred ninety square feet per floor. * * * Those rough estimate prices are always made as a guide to the Commission depending upon the amount of contract price submitted by the operator."

It is quite true that there is no evidence in the case that the building was not completed in accordance with the plans and specifications, or that the City will not be repaid the amount of its loan. But we think the evidence supports the inference that the City loaned a sum in excess of what it would have loaned had it been informed of the true nature of the agreements between the operator and the builder. We are unable to determine from the requisitions just what they included in the way

of overhead and profit. Finck testified he checked them to see whether they were in line with the overall contract price, to which he assumed the contractor was entitled. The architects, of course, checked the materials put in place as against the plans and specifications. But the jury could properly find that from the beginning the City relied upon an arms-length bargain between the operator and builder, and upon the representation that the operator had an actual financial stake in the project. As now appears, the operator has a building in which its investment is nominal, Piracci has a profit of some $20,-000, and the City has loaned, not 85%, but nearly 100% of the cost. While this may be termed "hindsight", the fact that all of the undisclosed agreements were predicated upon a division of potential savings, permits the inference that the parties knew that the estimated cost included not only a reasonable profit for Piracci, but a sum that would obviate the necessity of a 15% contribution by Haar and Winik. The jury could properly find that there was a common design to mislead the City into financing the project wholly with its own funds, and it was not compelled to accept Piracci's testimony that he was only making a loan that was not evidenced by anything except the "supplemental agreement", which dealt with "savings". We think there was legally sufficient evidence of a conspiracy to defraud the City, and that the case was properly submitted to the jury.

Objections were made to the admission of documents of or relating to Baltimore Garages, Inc., such as the loan contract, the supplemental loan contract, the minutes of the Commission, and the application of April 24, 1951, on the ground that these were the acts of alleged co-conspirators. There was a motion to strike at the end of the case. It is conceded that, in a conspiracy case, documents may be admitted as links in a chain, the order of proof being in the discretion of the trial court. *Bloomer v. State,* 48 Md. 521, 531; *Lawrence v. State, supra; Garland v. State,* 112 Md. 83. But the contention is, that the State did not make out a *prima facie* case, and in

the absence of such a case the documents are inadmissible. For reasons already stated, we think the State made out a *prima facie* case.

The court excluded, as not relevant, a minute of the Commission purporting to ratify, on August 5, 1953, the loan contract of January 17, 1951. The building had been fully completed in March, 1952. The purpose of the minute is not clear, nor is it shown that the Commission then had any more knowledge of the undisclosed agreements than it had in the beginning. Of course, the Commission could not ratify criminal activities of the accused in any event. We find no error in the ruling.

Finally, the appellants contend that the court erred in its instructions to the jury. They complain that the court did not confine the jury to a finding of conspiracy predicated upon fraud by "padding" in the original estimate of cost and in the building contract, but permitted the jury to consider other factors, such as the agreement with reference to the installment payments and advances by the builder to the operator covering the 15% contribution by the latter. The court did at one point refer to a "separate conspiracy" after an initial one, but a reading of the entire charge makes it clear, we think, that the court was referring to only one conspiracy which the State contended "was executed in either or both of two stages". The court referred to the State's claim of an agreement "to mislead the City of Baltimore by false representations in order to obtain a loan, or a larger loan * * * than the City would have granted if they had been told the truth or known the true facts. The State charges there were two false representations made. First, that during January, 1951, it was represented to the Off-Street Parking Commission that Piracci, Haar and Winik had entered into a construction contract for the building of the garage for a fixed price of $197,636 when the truth was they had entered into a contract on a cost-plus basis. * * * The second false representation charged is that during April, 1951, when the City was asked to permit the 15 per cent contribution of the op-

erators to be paid in installments they represented to the City that the installments were the money of Haar and Winik, or money which Haar and Winik were liable to repay, when the truth was that Piracci himself was putting up the money, not as a loan but as a credit which he charged to the cost of the building, and got back from payments made to him from the City." The court also said: "The case does not depend upon whether Dominic Piracci padded his figures in January, 1951. The case depends upon whether Piracci acting in concert with Haar and Winik at some time between January, 1951, and April, 1952, knowingly agreed to make false representations to the City about the contract arrangements for building, and the payment of installments by himself for the purpose of getting any loan, or getting a larger loan than the City would have made if it had known the true facts."

The appellants rely upon *MacEwen v. State,* 194 Md. 492, for the proposition that the commission of one crime cannot be shown by the proof of an unrelated one. In that case the crime charged was false pretenses on a certain date, but the only proof was of embezzlement on a later date. They also rely on *Lefco v. United States,* 74 F. 2d 66 (CCA 3d), for a statement that evidence of another conspiracy will not sustain the particular conspiracy charged in the indictment. Federal cases in this field must be accepted with some reservation because of the different concept noted in *Hurwitz v. State, supra.* It is clear under the Maryland authorities that the means whereby the object of the conspiracy is to be attained is a matter of evidence, and that when the proof shows such a connection between the different transactions as raises a fair inference of a common motive in each, the general rule as to unrelated offenses does not apply. The bill of particulars gave fair notice that the State would rely upon the circumstances of both the initial loan contract and the installment transaction. If the jury disbelieved the testimony as to one but not the other, there would still be evidence to support the verdict.

The appellants further contend that there was no evidence of "padding", but we have already discussed this point. Proof of padding was not an essential element in the case, as the court indicated. It is significant that the loan contract did not obligate the City to make advances in the amount of the figure mentioned, but only in an amount not to exceed that figure. If the City had known that the requisitions included advances by the builder to the operator, in excess of the $20,000 profit to which Piracci had limited himself by the undisclosed agreement, it seems clear that the requisitions, based on a schedule of payments predicated upon another type of contract would not have been approved. The payments by the City not only compensated the builder but reimbursed the operator for its contribution. A conspiracy to produce such a result by deception, as we have noted, might be shown by circumstantial evidence, even if the intended result had never been effected. The court's reference to the misrepresentation in connection with the extra work, is again simply another link in the chain. There was abundant evidence of participation by Piracci in the procurement of the loans and advances. We find no error in the court's charge.

*Judgments affirmed, with costs.*