MICHAEL EUGENE CONWAY *v.*
STATE OF MARYLAND

[No. 355, September Term, 1968.]

*Decided August 5, 1969.*

The cause was argued before MURPHY, C.J., and ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*James E. Thompson, Jr.* (*Edward Turner* on brief) for appellant.

*Bernard L. Silbert, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, J. Thomas Clark, State's Attorney for Queen Anne's County,* and *Fred A. Thayer, State's Attorney for Garrett County,* on the brief, for appellee.

MURPHY, C.J., delivered the opinion of the Court.

Appellant was found guilty of rape (without capital punishment) by a jury in the Circuit Court for Garrett County and was thereafter sentenced by the court to sixteen years under the jurisdiction of the Department of Correction. On this appeal from that judgment, his principal contentions are (a) that his confession was improperly admitted in evidence in violation of the principles enunciated in *Miranda v. Arizona*, 384 U. S. 436, and (b) that the State's Attorney made a highly prejudicial closing argument to the jury which deprived him of a fair trial.

At approximately 11:00 p.m. on the night of January 5, 1968, the prosecuting witness, an eighteen year old white girl, Brenda Wright, drove her car to a service station near Queenstown, Maryland to obtain gas. The appellant, a Negro, then eighteen years of age, was the sole attendant at the station. He told Brenda that he detected a knock in her engine and suggested that he move the car into the station garage and repair it. She agreed. After working on the car for a brief period, appellant attempted to kiss Brenda.

According to appellant's testimony, he had seen Brenda at the gas station on several prior occasions and his attempt to kiss her was responsive to her encouragement; and this was followed by an act of consensual sexual intercourse between them which began on the concrete floor of the station and ended on a bed in an adjacent room.

According to Brenda's testimony, she was frightened after appellant attempted to kiss her. She tried to leave the station but appellant overpowered her, tore her clothing off and raped her over a twenty minute period, first on the concrete floor and later on a cot in an adjoining room. Brenda testified that during the attack appellant told her he would slit her throat, but she nevertheless screamed and fought throughout the encounter. The evidence showed that Brenda was menstruating at the time

of the assault and that her sanitary pad was found the following day on the station floor.

Brenda testified that after the assault appellant stated that he was going to take her to New York; that he then drove off with her in her car until, in Chestertown, the car ran out of gas; that it was then about 1:00 a.m. and the temperature four degrees above zero; and that she was afraid that appellant was going to kill her.

The evidence showed that appellant and Brenda remained in the car while appellant hailed a number of passing motorists and inquired where he might obtain gas; that one of the persons he flagged was James Campbell, the town police officer, who was driving an unmarked vehicle; that another motorist helped appellant hand-push the car to the side of the road; and that Campbell, the town police officer returned on still another occasion, emerged from his car, and asked appellant and Brenda whether either owned an abandoned vehicle which he had discovered on the nearby highway. On none of these occasions did Brenda make any effort to flee from appellant, although each time she attempted by various gestures to attract attention to her predicament while appellant's back was turned. She testified that she was afraid to cry out for assistance.

Campbell notified the State Police of the parked vehicle and, in company with Campbell and another local police officer, Maryland State Trooper Gerald Taylor arrived at the scene. According to Brenda's testimony, she was at that time asleep and when the Trooper made his presence known, she jumped out of the car, crying and screaming, telling the officers that appellant had raped her.

Trooper Taylor testified that Brenda was crying and screaming as she emerged from the car and that she was "all messed up;" that she immediately stated that appellant had raped her and appellant then said, "I did it" and "you got me." Taylor's testimony was confirmed by that of Campbell.

Following his arrest, appellant was taken to the Kent County Sheriff's office, arriving at about 3:00 a.m. The evidence showed that after he was given the full panoply of *Miranda* [1] warnings, appellant stated that he knew his rights and wanted to make a confession. Trooper Taylor brought appellant to State Police Headquarters in Centreville at 3:20 a.m. where Trooper James Patchett again gave appellant his full *Miranda* warnings. At approximately 4:00 a.m., Patchett asked appellant some questions concerning the alleged crime, but appellant "stated that he, at that particular time, did not wish to answer any more questions, that he would like to have some time to think about it." Patchett promptly stopped the interrogation and at 4:30 a.m., appellant was returned to the jail.

The following evening at approximately 7:55 p.m. appellant was returned to the Centreville post where he was interrogated by Sergeant Emil Meyers. Earlier that day, Patchett had told Meyers of his attempt to interrogate appellant and of the fact that appellant had requested "time to think," as a result of which he (Patchett) had discontinued the questioning. The evidence showed that Meyers gave appellant his full *Miranda* warnings and that appellant said he fully understood them and would make a statement. The interrogation then proceeded, Meyers being alone with appellant.[2] After making a number of incriminating admissions concerning his involvement with Brenda at the gas station, appellant told Meyers that he got "a sudden impulse" and "that's when it all took place." At this point in the interrogation, appellant said "I don't want to go into that," to which Meyers responded:

> "Q. Do you mean you do not want to describe what you next did, or that you didn't do anything further?
> A. Well, that's when I had intercourse with her.

---

1. *Miranda v. Arizona, supra.*
2. Meyers personally typed each question as it was asked, together with appellant's answer.

> After all this took place, I put the fuses back in the car and told her I was going to take off and I asked her if she was going or was she going to stay. She said that she was going. That's when we ran out of gas in Chestertown. If she wanted to get away, I don't think I would have harmed her. In fact, I know I wouldn't."

Thereafter, appellant completed his statement and signed it.

Testifying on the voluntariness of his written statement, the appellant stated that he interrupted Patchett's interrogation because he "wanted to stop and have time to think about it and then I'd let him know." He testified that Sergeant Meyers came to the jail at about 7:00 p.m. and took him back to the Centreville post for questioning; that he (appellant) just wanted to tell the Sergeant "a little bit" but not "everything;" that he continued answering questions only because Sergeant Meyers continued asking them and while what he said was "in a sense" voluntary, he answered the Sergeant's questions because he was frightened.

The trial judge found that none of *Miranda's* precepts were violated in the taking of the written statement, and it was admitted in evidence.

## I

Appellant contends that the lower court erred in admitting his written confession into evidence because it resulted from interrogation improperly conducted after he had once invoked his Fifth Amendment privilege to remain silent. He relies on *Miranda* at pages 473-474, wherein it is held:

> "Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has

shown that he intends to exercise his Fifth Amendment privilege; *any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.* Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been *once invoked.*" (Italics added.)

In *People v. Fioritto,* 441 P. 2d 625, the accused, after being afforded his *Miranda* warnings, refused to execute a waiver. Shortly thereafter, he was confronted with two accomplices who had confessed and implicated him. At this point, the police again recited the *Miranda* warnings to the accused who executed a waiver and made a statement. The Supreme Court of California found the confession inadmissible under *Miranda,* stating at page 627:

"By his refusal to waive his constitutional rights initially, defendant indicated that he intended to assert his rights—the privilege had been *once invoked*—and all further attempts at police interrogation should have ceased. Although the confrontation of defendant with his two juvenile accomplices who had confessed injected a new factor into the questioning, the didactic language of the United States Supreme Court shows no disposition to permit subsequent interrogation in the absence of counsel even if authorities believe there has been a change of circumstances. Thus we have no alternative but to hold that the confession thereafter secured constituted inadmissible evidence at trial.

"In so holding, we prohibit only continued questioning after an individual has *once* asserted his constitutional rights."

In *People v. Ireland,* 450 P. 2d 580, the Supreme Court of California extended its holding in *Fioritto* to a case

where, at the time of arrest, the accused responded to a police question whether he had anything to say by asking them to "Call my parents for my attorney." The police made no such call and appellant subsequently confessed. The confession was found violative of *Miranda's* precepts, the court noting the holding at page 474 of that opinion that "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." See also *United States v. Nielsen*, 392 F. 2d 849 (7th Cir.), where the court held that although the accused requested counsel, interrogation thereafter was not improper where the accused subsequently "knowingly" and "intelligently" waived his rights to counsel and to remain silent. To like effect is *State v. Kelly*, 439 S.W.2d 487 (Mo.).

In *State v. McClelland*, 164 N.W.2d 189, the Supreme Court of Iowa held that although the accused at his initial police interrogation expressly stated that he didn't want to answer any questions, incriminating statements later made by him, following recitation of his *Miranda* warnings, were admissible, it being shown that there was no physical or psychological coercion brought to bear on the accused. The court there considered the argument that once an accused states that he wishes to invoke his constitutional privilege to remain silent, any information obtained by subsequent interrogation is inadmissible in evidence. The court held at page 193:

> "It is at once apparent the inevitable consequence of such a holding would be an ironclad rule prohibiting police officers from subsequently inquiring of a defendant who has invoked his right to silence whether he wishes at any time to waive that right. Certainly a defendant has a right to reconsider and change his decision in the matter. We do not believe *Miranda* goes so far as to exclude all answers to questions put to defendants after they have claimed their right to remain silent."

The court in *McClelland* concluded that the proper test to determine whether a statement given under such circumstances is admissible in evidence is whether the totality of the facts—the attendant circumstances—clearly show that the accused subsequently waived his *Miranda* rights and that the incriminating statements thereafter made were wholly voluntary.

In *Jennings v. United States,* 391 F. 2d 512 (5th Cir.), the defendant, after answering several police questions, refused to answer further but shortly thereafter he was again given his *Miranda* warnings, signed a waiver and confessed. In holding the confession properly admissible in evidence, the court said at page 515:

> "* * * It seems clear to us that what the Court sought to interdict in *Miranda* were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take 'no' for an answer. Disregarding his constitutional claim, they continue to ask questions, see 384 U. S. at 453, 86 S. Ct. 1602, 16 L.Ed.2d 694. These techniques were not used in this case. It is admitted that the local police cease interrogation immediately upon appellant's expression of an unwillingness to proceed further."

Under a similar factual situation the court in *State v. Bishop,* 158 S.E.2d 511 (N.C.), stated at page 520:

> "We do not interpret the portion of the *Miranda* opinion now under consideration to mean that when a defendant is 'in custody' and has been duly advised of his constitutional rights, and he states that he does not want to make a statement at the first questioning, that law enforcement officers are forever barred from asking another question. We do interpret it to mean that when a defendant is being interrogated and he indicates that he wishes to remain silent, that

interrogation must not then be continued. The vice sought to be removed is the evil of continued, incessant harrassment by interrogation which results in breaking the will of the suspect, thereby making his statement involuntary."

And in *State v. Godfrey*, 155 N.W.2d 438 (Neb.), where the defendant, after receiving his *Miranda* warnings, refused to answer any questions but soon thereafter was re-warned under *Miranda*, executed a waiver and confessed, the court said at pages 441-442:

"We recognize that the police cannot be permitted to attempt an in-custody interrogation and, upon being met with a refusal, return a prisoner to his cell and then attempt to repeat the procedure periodically until a statement is obtained. However, an otherwise valid voluntary waiver of both the right to counsel and the right to remain silent, knowingly and intelligently made, followed by a statement, should not be transformed into invalidity merely because of silence at some prior time. One refusal to make a statement, when that refusal is fully honored, ought not to taint the substance of the entire subsequent procedures under the circumstances here. * * *

"We hold that the fact that a defendant, as a part of the initial procedures at a police station, after full *Miranda* warnings, is asked whether he desires to make a statement at that time and answers negatively, does not automatically invoke his right to counsel and render inadmissible any subsequent statement obtained in the absence of counsel. Neither does such a factual circumstance, coupled with the other facts here, prohibit or invalidate a later waiver voluntarily, knowingly, and intelligently made."

See also *State v. Lopez*, 452 P. 2d 199 (N.Mex.), and compare *Bazzell v. State*, 6 Md. App. 194.

We cannot agree with the holding in *Fioritto* that *Miranda* compels the conclusion that once the individual undergoing custodial interrogation invokes his privilege to remain silent he cannot thereafter, under any circumstances, be questioned, at least in the absence of counsel. We think the better rule is enunciated by those cases which hold in effect that the individual's right to remain silent, though once invoked, may subsequently, under appropriate circumstances, be waived within the rule governing the waiver of federal constitutional rights articulated in *Johnson v. Zerbst*, 304 U. S. 458, which was adopted in *Miranda, viz.*, an intentional relinquishment or abandonment of a known right or privilege the determination of which depends in each case upon the particular facts and circumstances surrounding that case.

Appellant's own testimony indicates that in initially invoking his privilege to remain silent, he did so conditionally—that he refused *at that time* to answer questions put to him by Trooper Patchett because he wanted time to think. Under these circumstances, we think it entirely proper that the police, having discontinued questioning appellant in accordance with his direction, undertake a reasonable time thereafter to again interrogate him. The record shows that approximately sixteen hours elapsed before Sergeant Meyers resumed the interrogation. And immediately prior thereto, appellant was once again afforded his *Miranda* warnings, and stated that he understood them and nevertheless wanted at that time to make a statement. The record is devoid of any evidence of coercion, physical or mental. Appellant admitted in his testimony that after being told of his right to counsel by both Patchett and Meyers he did not request counsel.[3]

---

3. In his testimony appellant stated that he asked Trooper Taylor for a lawyer, but qualified his testimony by adding that he doubted whether the trooper heard him. In his testimony, Taylor stated that he had no recollection that appellant asked for counsel. And while there is some vague suggestion in appellant's testimony that he wanted to communicate with the Sheriff at the jail in order to secure counsel, but that the Sheriff would not see him, we find such testimony not sufficiently certain and definite to be the equivalent of a request for counsel.

Although appellant had but an eighth grade education and was only eighteen years of age, we think the record supports the conclusion that the State discharged its heavy burden of showing that the appellant knowingly and intelligently waived his privilege against self-incrimination when he agreed to answer Sergeant Meyers' questions. *Anderson v. State,* 6 Md. App. 688; *Brown v. State,* 3 Md. App. 313. And when, in the course of that interrogation, appellant made a number of incriminating admissions, and then showed reluctance to relate the details of the intercourse by stating, "I don't want to go into that," we think Sergeant Meyers properly sought clarification of appellant's intention when he asked him, "Do you mean you do not want to describe what you next did or that you didn't do anything further." We do not, therefore, believe that such reluctance on appellant's part was the equivalent of invoking his right to remain silent, and, consequently, continuation of the questioning after appellant indicated willingness to proceed was not improper. We conclude that under the particular facts and circumstances of this case, the taking of appellant's written confession in no way violated *Miranda's* teachings and that the confession was properly received in evidence.

## II

Prior to trial, appellant filed a motion to suppress a prior conviction sustained by him on June 27, 1963 for assault with intent to rape. The motion was based on the three-fold ground (a) that its introduction in evidence would inflame the jury, (b) that it would mislead the jury into believing that he had committed the present offense because he had been previously convicted of committing a similar offense, and (c) that assault with intent to rape is not a crime which would tend to establish that the perpetrator could not be believed under oath. The motion was denied but it was renewed when, on cross-examination, appellant was asked by the State's Attorney whether he had been convicted of that crime. The court again overruled appellant's objection to the ques-

tion and the appellant answered in the affirmative. A certified copy of the pertinent docket entries was then placed into evidence.

At the conclusion of the trial, the court gave its advisory instructions to the jury, no mention being made therein of the prior conviction. No exceptions were taken to the instructions.

The closing arguments of counsel, reported in full in the record, were then made. Toward the conclusion of his closing rebuttal argument, the prosecutor told the jury:

> "* * * But I would like to also point out to you that although, when you find this young man guilty, it is certainly going to affect him, but you've also got to think about Brenda Jean Wright. The damage to her is certainly irreparable. She's got a mark and a memory that she'll carry every waking moment of her life. *You also have to think about other young girls in similar circumstances. This isn't the first time for this young man. He was convicted of assault with intent to rape before.* (Italics supplied.)

At this point, defense counsel interjected: "Your honor, we think this is improper argument." The court asked, "Why," and this colloquy then ensued:

> "BY MR. THOMPSON [defense counsel]:
> Because he is referring to other—the only purpose of the Court, as I understood it, in allowing the conviction in was to bear on his credibility, not his likelihood to do it again, and that is exactly what Mr. Thayer is arguing, which is improper.
> "BY THE COURT:
> All right, Mr. Thayer, let's not dwell on the previous conviction.
> "BY MR. THAYER [State's Attorney]:
> Yes, sir."

Appellant's counsel made no motion to strike the im-

proper remarks, nor did he move for a mistrial or request the court to give a corrective instruction to the jury.

Appellant now contends that the prosecutor, "in closing argument improperly used evidence of the Defendant's prior conviction to inflame the passion of the jury against the Defendant as a person who, because of a previous conviction for a similar offense, endangered all young girls and because of the prior conviction must have committed the offense charged."

We think it clear that a prior conviction for assault with intent to rape may be shown to impeach credibility. It is equally clear on the facts of this case that the prior conviction would not have been admissible for any other purpose.[4] Cf. *Gordon v. State*, 5 Md. App. 291. Yet, by his argument, the prosecutor improperly sought to convey to the jury the thought that in determining whether appellant raped the prosecutrix, it could consider as evidence of his guilt the fact that he had been previously convicted of a similar offense. The trial judge did not undertake, *sua sponte*, to correct the erroneous argument; and by inquiring why the obviously improper argument was in fact improper, coupled only with his admonition to the State's Attorney "not [to] dwell on the previous conviction," the trial judge did little to dispel the impression that the jurors were free to consider appellant's prior conviction as substantive evidence of his guilt in the rape of Brenda Wright.

In *Holbrook v. State*, 6 Md. App. 265, 270, we held that unless it appears that the jury was actually misled or was likely to have been misled or influenced to the prejudice of the accused by the prosecutor's improper argument to the jury, reversal of the conviction would not be warranted; and that in applying the rule a significant factor

---

4. It is well settled that, with certain exceptions not here applicable, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged, is incompetent and inadmissible for the purpose of showing commission of the particular crime charged. See *Wethington v. State*, 3 Md. App. 237, 240.

in determining whether the jury was likely to have been misled or prejudicially influenced is whether the trial court took appropriate action to overcome a likelihood of prejudice, *e.g.*, informing the jury that the remark was improper, striking it and admonishing the jurors to disregard it. Ordinarily, to preserve the question of the impropriety of a prosecutor's jury argument for appellate review, the accused should make proper objection and move to strike it, or for a mistrial. See *Day v. State*, 2 Md. App. 334. But as we pointed out in *Holbrook*, there are some instances where the prosecutor's improper argument before a jury is of such consequence and magnitude, and so threatens to deprive the accused of his right to a fair trial, that the trial judge, even absent objection, bears the responsibility on his own to take curative action in an attempt to overcome the likelihood of prejudice.

We think it too plain to require discussion that the prosecutor's improper remarks were highly prejudicial, particularly so in view of the fact that appellant, by motion prior to trial, had sought to suppress the prior conviction on the ground, among others that it would mislead the jury into believing that he had committed the present offense because he had been previously convicted of committing a similar offense. In this light, when the prosecutor told the jury that it should consider the fact that "This isn't the first time for this young man;" and that "He was convicted of assault with intent to rape before," we think the occasion was one screaming out for the forceful interdiction of the trial judge, *viz.*, an instruction to the jury that the argument was improper, why it was improper, and a severe reprimand to the prosecutor for making it.

We, of course, have no way of calculating the consideration given by the jury to appellant's prior conviction for assault with intent to rape. We cannot know, therefore, whether the jury considered such evidence as substantive proof of appellant's guilt or merely as evidence impeaching his credibility as a witness. That the jury

was free to consider the prior conviction as substantive proof of guilt is, however, entirely clear and we conclude that the jury was likely misled or influenced to appellant's prejudice and that under the circumstances the prosecutor's improper argument deprived appellant of a fair trial. See *Wethington v. State, supra.*

In so concluding we are mindful of the rule that an improper reference to a prior conviction might not constitute reversible error where it was of such minor importance that it was unlikely that the accused could have been prejudiced thereby, or where the State's evidence was so strong that it is improbable that a contrary result would have been reached by the jury. See *Lamar v. State,* 5 Md. App. 594. That a prior conviction for assault with intent to rape would not ordinarily be of minor significance in a rape prosecution is readily apparent. And while the State's evidence of appellant's guilt was indeed highly persuasive, we do not think it so overwhelming that there was no probability that the improper use of the prior conviction would have changed the result. The basis of appellant's defense was consent, and he sought to support it by placing emphasis on the evidence that the prosecutrix made no effort to flee his presence during the time they were parked in Chestertown, even though several motorists, including the town policeman, stopped to inquire; that there was no evidence that appellant ever had a weapon; that the prosecutrix was not physically injured; and that the prosecutrix weighed 180 lbs. while the appellant weighed but 155 lbs. We cannot say *beyond a reasonable doubt* that a contrary result would not have been reached had not the improper jury argument been made.

*Judgment reversed; case remanded for a new trial.*