# FRANK (NMN) MARINI *v.* STATE OF MARYLAND

[No. 95, September Term, 1975.]

*Decided January 28, 1976.*

The cause was argued before MORTON, DAVIDSON and LOWE, JJ.

*Richard A. Cooper, Assigned Public Defender,* for appellant.

*Leroy Handwerger, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Robert C. Nalley, State's Attorney for Charles County,* on the brief, for appellee.

MORTON, J., delivered the opinion of the Court. DAVIDSON, J., dissents and filed a dissenting opinion at page 31 *infra.*

A jury sitting in the Circuit Court for Charles County found appellant guilty of receiving stolen goods. Judge James C. Mitchell, who presided, sentenced appellant to a term of five years. The issues raised in this appeal, which require only a brief statement of the facts, will be treated *seriatim.*

There was evidence to show that on September 29, 1974, James Renjilian, who lived in Oxon Hill, Maryland, discovered that his 1966 Ford Mustang, which he had left locked in his driveway, was missing. On November 3, 1974, at about 8 p.m., two officers associated with the Charles County Sheriff's Department, responded to a call concerning a possible breaking and entering of an abandoned store located in Indian Head, Maryland. Upon their arrival, they discovered the car previously stolen from Mr. Renjilian parked in front of the store. They apprehended the appellant inside the store. According to the police, the appellant, having been advised of his rights, originally disclaimed ownership of the car. After one of the police officers found a note in the car bearing the appellant's name, the appellant

told the officers that he had purchased the car in Virginia. No certificate of title, registration card or similar document was found when the police searched the appellant's person and the vehicle.

At trial, the appellant, having been advised of his rights, elected to testify. On direct examination he stated that in both 1967 and 1970 he had been convicted of offenses involving stolen motor vehicles. He conceded that at the time of his arrest he was in possession of a 1966 Ford Mustang but insisted that he had purchased the automobile in Alexandria, Virginia, on October 8, 1974. He offered testimony concerning the circumstances surrounding the purchase of the car and an explanation as to why he did not have the title or registration certificate. He denied that he had stolen the car and that he had any knowledge that the car had been stolen.

On cross-examination the appellant stated that he had gotten the license plate found on the car at the time of his arrest from a friend named "Miss Carter" who lived on Duke Street in Alexandria, but he could not remember the house number. The following colloquy between the state's attorney and the appellant then took place:

"Q. Where is Miss Carter today?
A. Who?
Q. Miss Carter.
A. (Witness shakes head.) I don't know.
Q. Who is Miss Carter?
A. Miss Carter?
Q. Uh-huh.
A. It is a friend of mine.
Q. All right. You don't know where she is today?
A. (Witness shakes head.)
Q. Have you made any efforts to get in touch with her?
A. (Witness shakes head.)
Q. That is a 'no,' I take it. Why not?

A. (Witness shakes head.)

Q. Huh? You just said a few minutes ago that the tags you had on the car was hers? Wouldn't she be capable of backing that story up? Huh?

A. (No response.)

Q. Yes or no, sir?

A. (No response.)

Q. The tags weren't stolen from her, were they? Or were they?

THE COURT: Mr. Marini [appellant], you will have to respond to the questions. You will have to answer the questions.

THE WITNESS: No, the tags weren't stolen.

BY MR. NALLEY:

Q. From her?

A. No.

Q. Would it surprise you to learn that they were in fact stolen from somebody else? Yes or no, sir? Would it surprise you to learn that they were in fact stolen from somebody else?

A. (No response.)

Q. Do you know a Kathleen F. McCarthy?

A. (No response.)

MR. NALLEY: Your Honor, I would ask that you instruct him again to respond either 'yes' or 'no' to that question.

THE COURT: Yes, Mr. Marini, you will have to answer the questions. Do you understand the question?

THE WITNESS: Yes, I understand it.

THE COURT: All right, you will have to answer it. Can you answer it 'yes' or 'no'?

BY MR. NALLEY:

Q. Do you know, sir, a Kathleen F. McCarthy?

A. (No response.)

Q. Are you familiar with the address 4600 Duke Street, Alexandria?

A. Yes, I am familiar with it.

Q. With this address, what kind of place is this?

A. It is an apartment.

Q. All right, do you know a Miss McCarthy who lives in that building?

A. Yes, I know her.

Q. All right, what kind of car does she have?

A. What kind of car does she have?

Q. Uh-huh.

A. She just bought a brand new one.

Q. Would it surprise you to learn that the tags that were on the car you were driving, on the 3rd of November, belonged to her?

A. Yes, I know they belonged to her because she let me use them.

Q. I thought you said a few minutes ago that a Miss Carter let you use them?

A. Same name. Same name because I ain't seen her in years. Only been going around to see her once in a while.

Q. How did you get the tags from her?

A. I borrowed them. I borrowed them from her.

Q. *Would it surprise you to know that she reported them as stolen to the Alexandria Police?*

MR. MUDD [Defense counsel]: *Objection. Unless the State can prove that.*

THE COURT: *I assume the question was asked on that basis.*

MR. MUDD: *I would like a proffer from the State. That they can prove that to-day.*

MR. NALLEY: *I don't believe we could prove that today, Your Honor. It is a*

*matter of record. It could be proved. I don't have Miss McCarthy here or a representative of the Alexandria Police here today, if that is the point that is being made.*

(Emphasis supplied.)

BY MR. NALLEY:

Q. This goes back to the question, Mr. Marini, I thought you said a few minutes ago that you didn't know how to get in touch with the lady from whom you had gotten tags or you had not tried to get in touch with her during the months you had been in jail; is that correct?

A. What are you trying to do, put her in jail, too?

Q. I am asking you why you haven't got in touch with her during the last two months, Mr. Marini. That is what I am asking. Why not? And don't tell me you haven't had her address. You have had her address since the week after you got in jail.

A. Your Honor, can I be excused?

THE COURT: No. You will have to—

THE WITNESS: I ain't going to answer no more questions if I sit here.

THE COURT: You took the witness stand.

THE WITNESS: I answered all the questions I was going to answer today. This is it. I ain't answering no more questions.

THE COURT: Mr. Gilroy, would you take the jury out, please.

(Whereupon, at 2:03 o'clock p.m. the jury was taken to the jury room and the following proceedings were had out of the hearing of the jury:

THE COURT: Mr. Marini, as you know, you had a right to take the witness stand and testify or you had a right not to testify in this case. The Court explained that to you. When you take the stand, you cannot elect what questions you will answer and what questions you will not answer. You have taken the stand and you are subject to cross-examination on your testimony. Now you have indicated to this Court that you have reached the point where you refuse to answer any more questions. Does the Court understand that correctly?

THE WITNESS: Yes.

THE COURT: If you persist in that position it would constitute a contempt of court and subject you to punishment such as the Court deemed appropriate for that criminal contempt. Now with that information, do you wish to answer questions or do you wish to remain in contempt of the court for refusing to answer?

MR. MUDD: Your Honor, might I just have a word with him before he responds?

THE COURT: Yes.

MR. MUDD: Mr. Marini, all you have to answer is either 'yes' or 'no' to a question or 'I do not know.' And I would strongly urge you to answer the questions. If you do not have an answer, just say 'I don't know.' The problem is that no response is going to put you in contempt of court. Do you understand that?

(Witness nods head.)

WITNESS: Yes.

MR. MUDD: Are you willing to continue with the cross-examination now?

THE WITNESS: Yes.

THE COURT: All right, Mr. Gilroy, you can bring the jury back).
(Whereupon, the jury returned to the courtroom and resumed their seats in the jury box and the following proceedings were had in the presence and hearing of the jury, the jury returning at 2:05 o'clock p.m.)
CROSS-EXAMINATION (Continued)

BY MR. NALLEY:

Q. Mr. Marini, I believe the question was whether you had made any efforts to get in touch with Kathleen McCarthy since you went to jail?

A. I don't know.

Q. You don't know what?

A. I don't know.

Q. You don't know whether you have tried to get in touch with her or not? Is that what you are saying? Is that what you are saying?

A. (Witness does not respond.)

Q. Is that what you are saying?

THE COURT: All right, Mr. Nalley, he answered the question. It is up to the jury to assess his testimony.

BY MR. NALLEY:

Q. What did you say to Miss McCarthy, Mr. Marini, when you asked for the tags?

A. I don't know.

Q. You don't know what you said to her? What did she say to you when you asked her for the tags?

A. I don't know.

MR. MUDD: Your Honor, I will object. I think we are getting beyond the scope of direct examination. We really didn't get into the question of how the automobile was tagged at the present time when he was arrested, and I really don't see what relevance that has to the proceeding. I think we are just prolonging something that really has little significance.

MR. NALLEY: *If the Court please, I think it has every bit of significance, going into this Defendant's credibility when he said he is, implying in his testimony that he had no reason to believe or suspect this car might be stolen.*

THE COURT: Mr. Nalley, seems to me you have gotten the answers.

MR. NALLEY: I am getting 'I don't know,' Your Honor. I just want to get as many as I can.

THE COURT: There is a limit as to how many you need." (Emphasis added.)

In this factual posture it is contended that "the failure of the State's Attorney either to offer evidence establishing the commission of such offense or to disclaim any intimation that the Appellant had committed such offense was prejudicial error, which was not cured by an instruction from the trial judge." Otherwise expressed, it is contended that the failure of the state's attorney to offer proof in support of his question to the appellant that the tags had been reported stolen and to disclaim any intention that appellant had stolen them constituted error which was compounded by the failure of the trial judge to give a "curative instruction."

28

In support of this contention we are referred to the decision of the Court of Appeals in *Cook v. State*, 225 Md. 603, and the decision of this Court in *Woodell and Mercer v. State*, 2 Md. App. 433. In *Cook* the state's attorney asked Cook, during the course of cross-examination, if he had ever been convicted of a crime. When Cook answered that he was "pretty sure" he had not been, the state's attorney asked: "* * * you were charged with breaking and entering * * * you received a generally suspended sentence * * *. Do you remember that?" Cook replied that he did not remember. Judge Prescott (later Chief Judge) pointed out for the Court, at 609: "The State's Attorney did not then, nor at any subsequent time, proffer to show that the appellant had been convicted of a crime, as was so strongly intimated in his questions, nor did he ask leave of the court to explain to the jury that he desired to disclaim any intimation from his question that the defendant has previously been convicted of a crime." Judge Prescott then announced, at 609: "The questions were, we think, highly improper in the absence of the State being able to establish that the defendant had been convicted in accordance with the statement of the State's Attorney; and, were it not for the care with which the trial court explained the matter to the jury, would require a reversal of the judgment and a new trial."

In *Woodell and Mercer v. State, supra,* the state's attorney during cross-examination questioned Mercer about his convictions of assault by threat, public drunkenness, worthless check and exceeding the speed limit, all of which allegedly occurred in Raleigh, North Carolina. Mercer could not remember the first two convictions, denied the last two convictions and asserted that he had never been in Raleigh, North Carolina. The state's attorney then alluded to Mercer's F.B.I. record and "asked Mercer whether he thought anyone else had his fingerprints, the clear implication intended to be conveyed to the jury being that the State's Attorney had access to Mercer's F.B.I. record which indicated that he had indeed been convicted of these offenses. The State's Attorney did not otherwise proffer to show that the appellant had been convicted of these crimes."

Judge Murphy (then Chief Judge of this Court) announced for the Court, at 438: "The present case presents a more extreme example than that contained in *Cook,* since here the State's Attorney sought to buttress his intimation that Mercer was lying in denying the convictions by referring to his criminal record on file with the F.B.I. (an organization held in high public esteem)." He then went on to say, at 439:

"If the State's Attorney chooses not to offer appropriate evidence of the prior conviction, he should, under the dictates of *Cook,* seek leave of court to explain to the jury that he disclaims any intimation from his question that the defendant had previously been convicted of such crime. Failure to do so may result in an appellate reversal of the conviction where the error cannot be deemed harmless, and the point is properly preserved for review on appeal.

Appellants here entered no objection to the questions propounded by the State's Attorney, and neither moved for a mistrial nor sought an advisory instruction from the court as they might have done under *Cook.* Under these circumstances, the matter was not before the trial judge for a ruling and consequently is not properly before us for review."

From the record before us, it is apparent the procedural pattern here is not entirely unlike that which confronted the Court in *Woodell and Mercer* and we must conclude here, as there, that the issue is not properly before us. In the first place, the question posed by the state's attorney at the trial below: "Would it surprise you to know that she reported them [the license tags] as stolen to the Alexandria Police?", did not directly accuse Marini of having stolen the tags and, in the second place, the question was never answered by Marini. The appellant seems to concede this but argues that the jury could draw an inference that appellant stole the tags when the state's attorney announced: "I don't believe we could prove that today, Your Honor. It is a matter of record. It could be proved."

We think any inference that the appellant himself stole the tags is, at best, tenuous and, in any event, was attenuated by the prior question put to him by the state's attorney: "Would it surprise you to learn that they were in fact stolen from somebody else?" This question was not objected to and not answered. But whether or not an inference could be drawn that the appellant stole the tags, it is apparent that the court did not require the appellant to answer the question propounded to him; there was no request for a mistrial when the state's attorney announced he could not "prove today" that the tags were stolen; and no advisory instruction was sought from the court. We cannot agree that the court had an obligation "to give a *sua sponte* instruction to cure an error." Thus, as in *Woodell and Mercer*, we must find that the issue is not properly before us. Maryland Rule 1085.

It is next contended that the judgment of conviction should be reversed because "the State did not sustain its burden of proving that the fair market value of the property in question was $100 or more." The owner of the stolen automobile, a Mustang, testified that he had paid "about $2,800" for it in 1966 and "to me it had a value of $2,000. I am talking about replacement." He further stated that four months prior to its being stolen he had purchased tires for it, costing a total of $120. The police officer who received the car testified it was in average condition. While it is true that fair market value, rather than replacement value, is the required measure of value, *Barber v. State*, 23 Md. App. 655, we think the jury could draw a fair inference from the evidence of the original purchase price, the replacement value to the owner and the cost of the tires recently placed on the vehicle that the car had a fair market value in excess of $100. *See Vucci v. State*, 13 Md. App. 694. Even the appellant, whose defense was that he had purchased the car, asserted that the purchase price was $400. We find no merit in the contention.

Finally, it is contended that "The Court erred in refusing to instruct the jury * * * that they could not find that the Appellant had knowledge that the property in question was

stolen only because they disbelieved his testimony denying such knowledge * * *," citing *Carter v. State,* 10 Md. App. 50. In *Carter* we said, at 53: "Generally, disbelieving evidence provides no basis for finding evidence to the contrary; however, there is an exception involving *scienter* or guilty knowledge, *i.e.,* reasons for disbelieving a denial of *scienter* may provide a basis for finding *scienter.*" We also said in *Carter,* at 55: " * * * changes in defendant's explanation or conflicting admissions may support a finding of *scienter,* since while either of defendant's stories may be true, both cannot be and the changes indicate an attempt to hide the guilty knowledge."

Here, the appellant, when first apprehended by the police, completely denied ownership of the vehicle. Later he changed his story by asserting that he had innocently purchased the car without knowledge that it had been stolen. Since these conflicting statements could support a finding of *scienter,* the instruction requested by the appellant was not required under the evidence. We agreed with the observation of the trial judge that the giving of such an unrequired instruction would have served only to confuse the jury.

We find no merit in the contentions, advanced *pro se* by the appellant, that the evidence was insufficient to sustain his conviction and that his trial counsel was incompetent. There was ample evidence from which the jury could find the appellant guilty of receiving stolen goods, *Williams and McClelland v. State,* 5 Md. App. 450, and the incompetency of counsel charge, not having been raised below, is not a proper issue in this appeal. *White v. State,* 17 Md. App. 58; Maryland Rule 1085.

*Judgment affirmed.*

*Davidson, J., dissenting:*

I do not agree with the majority that the State's Attorney's question as to whether it would surprise the appellant to know that Miss McCarthy had reported the license tags on the car found in his possession to be stolen,

and the State's Attorney's statements, made in the presence of the jury, to the effect that the report of the theft of the license tags was "a matter of record" which "could be proved," were not prejudicial because they did not support an inference that the appellant stole the tags. I believe that not only the State's Attorney's initial question and assertions, but also his subsequent line of questioning with respect to the ownership and transfer of the tags, which he himself described as designed to discredit the appellant's testimony "that he had no reason to believe or suspect this car might be stolen," were highly prejudicial. In my view, the State's Attorney's questions, coupled with his statements, not only raised the inference that the appellant had stolen the license tags and was, therefore, lying under oath when he denied the theft, but also supported the further inference that, in fact, he knew that the vehicle found in his possession was stolen property for which he could procure license tags only by illegal means. As a result of the injection of these inferences, based upon facts which were not in evidence, the jury was misled. Under these circumstances, the State's Attorney's failure to offer evidence establishing that the appellant had stolen the license tags, or to disclaim any intimation from his questions and assertions that the plates had been stolen, coupled with the trial court's failure to stop the line of questioning and to give cautionary instructions to the jury indicating that they should disregard the State's Attorney's questions and statements, as well as any inferences therefrom, constituted reversible error.

The prosecutor should make no remarks in the presence of the jury calculated to unfairly prejudice the jury against the accused and to deprive him of a fair trial.[1] It is unquestionably wrong for the prosecutor at any point in the trial, when in the presence of the jury, to refer to any matter not testified to by a witness or disclosed by the evidence in

---

1. Newton v. State, 147 Md. 71, 92, 127 A. 123, 132 (1924); Meno v. State, 117 Md. 435, 440-43, 83 A. 759, 761 (1912).

the case, including during an opening statement,[2] during the trial,[3] and in closing argument.[4]

Not every improper remark made by counsel during the progress of the trial is cause for challenge or mistrial. What exceeds the limits of permissible comment depends upon the facts in each case. Unless it appears that the jury was actually misled or likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney, reversal of a conviction on this ground would not be justified.[5] Finally, concerning what may be "prejudicial," the Court of Appeals, in *Wilhelm, supra,* quoting from *Gaither v. United States,* 413 F. 2d 1061 (D. C. Cir. 1969), stated:

> "The applicable test for prejudice is whether we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." (Citations omitted.) [6]

In *Esterline, supra,* where a defense witness testified in support of self-defense, that immediately after the fight the appellant "had finger prints on his throat," and the State's Attorney in closing argument stated that had he known such evidence would be produced, he "could have pro-

---

**2.** Wilhelm v. State, 272 Md. 404, 412, 326 A. 2d 707, 716 (1974); Clarke v. State, 238 Md. 11, 19-20, 207 A. 2d 456, 460-61 (1965); Ott v. State, 11 Md. App. 259, 266, 273 A. 2d 630, 634-35, *cert. denied,* 262 Md. 748 (1971).

**3.** Cook v. State, 225 Md. 603, 609, 171 A. 2d 460, 463 (1961); *cert. denied,* 368 U. S. 970, 82 S. Ct. 455, 7 L.Ed.2d § 98 (1962); Newton, *supra,* 147 Md. at 92, 127 A. at 132; Meno, *supra,* 117 Md. at 440-43, 83 A. at 761; Woodell v. State, 2 Md. App. 433, 439, 234 A. 2d 890, 893 (1967).

**4.** Esterline v. State, 105 Md. 629, 637, 66 A. 269, 272 (1907); Howard v. State, 19 Md. App. 673, 676, 313 A. 2d 567, 568 (1974); Reidy v. State, 8 Md. App. 169, 172, 259 A. 2d 66, 68 (1969).

**5.** Wilhelm, *supra,* 272 Md. at 415, 326 A. 2d at 715-16; Howard, *supra,* 19 Md. App. at 676, 313 A. 2d at 568.

**6.** Wilhelm, *supra,* 272 Md. at 416, 326 A. 2d at 716.

duced a hundred witnesses to prove that there were no finger prints on his throat at that time," the argument was held to be improper. There the Court said:

"It was undoubtedly improper for the State's Attorney to have told the jury that he could have proved by a hundred witnesses the falsity of Mary J. Diehl's testimony, that the prisoner had finger marks on his throat immediately after the shooting. This remark was objected to as improper, and the Court in the presence of the jury told the State's Attorney that it was not proper for him to make that statement. The State's officer then apologized for making it and promptly withdrew the objectionable statement." [7]

The conviction was not reversed.

In *Meno, supra,* the State's Attorney interrupted a prosecution witness during cross-examination and, by way of answer to a question which had been asked of the witness, injected the statement that the deceased victim had told the witness that the accused had aborted her. Manifestly, the State's Attorney's statement consisted of hearsay evidence which would have been inadmissible had the State attempted to introduce it. The Court found that the prosecutor's attempt to establish the accused's criminal agency by putting before the jury facts which were not and could not be placed into evidence, constituted improper conduct. There the Court of Appeals said:

"The statement made by the State's Attorney could not have been admitted in evidence if it had been testified to by the witness, for it was clearly hearsay. For the State's Attorney to inject it into the case in the manner he did was highly improper, and he should have been checked immediately by the Court, and the jury instructed to totally

---

7. Esterline, *supra,* 105 Md. at 637, 66 A. at 272.

disregard his remark, neither of which things appear to have been done. . . .

. . . .

" . . . The remark of the State's officer was not checked by the Court, nor were the jury cautioned or instructed by the Court to pay no heed to it. In such a condition it seems impossible that the jury should not have been unduly prejudiced against the accused." [8]

The conviction was reversed.

In *Newton, supra,* remarks by the prosecutor were found to be improper. There, in a dialogue with the court as to whether or not the defendant could testify that an audit had been made, he replied, in the presence of the jury:

"No. Sir, because I have tried this very traverser and heard him swear that he did not."

The court then said:

"That these remarks on the part of the State's attorney were exceedingly improper and calculated to unfairly prejudice the jury against the defendant, is scarcely a matter for argument, and the court should have warned the jury to disregard them. But as the remarks were upon motion stricken out, and as the traverser at the time asked for no other action on the part of the court, we do not regard its failure to so warn the jury as reversible error." [9]

In *Cook, supra,* an accused, in response to a question from the State's Attorney on cross-examination, stated that he was "pretty sure" he had never been convicted of a crime. Notwithstanding this response, the State's Attorney repeatedly questioned the accused as to whether he had been convicted on a specified date for a named offense. The

---

8. Meno, *supra,* 117 Md. at 442, 83 A. at 761.
9. Newton, *supra* 147 Md. at 92, 127 A. at 132.

appellant's counsel moved for a mistrial. The court there said:

> "The State's Attorney did not then, nor at any subsequent time, proffer to show that the appellant had been convicted of a crime, as was so strongly intimated in his questions, nor did he ask leave of the court to explain to the jury that he desired to disclaim any intimation from his question that the defendant had previously been convicted of a crime. The questions were, we think, highly improper in the absence of the State being able to establish that the defendant had been convicted in accordance with the statement of the State's Attorney; and, were it not for the care with which the trial court explained the matter to the jury, would require a reversal of the judgment and a new trial." [10]

In *Woodell, supra,* the State's Attorney, after asking the accused about two prior criminal convictions, which he admitted, proceeded to question him concerning convictions of assault by threat, public drunkenness, passing a worthless check, and exceeding the speed limit in a motor vehicle, all of which allegedly occurred in Raleigh, North Carolina. The accused stated that he did not remember the assault and drunkenness convictions, that he had not been convicted of passing a worthless check or of speeding, and that he had never been in Raleigh, North Carolina. The State's Attorney then alluded to the accused's F.B.I. record, and asked him whether he thought anyone else had his fingerprints, the clear implication being that the State's Attorney had access to his F.B.I. record which indicated that he had been convicted of these offenses. The State's Attorney failed to proffer evidence that the accused had been convicted of these crimes.

The Court of Appeals found the State's Attorney's conduct to be a more extreme example of improper conduct than that contained in *Cook* because the State's Attorney had sought

---

10. Cook, *supra,* 225 Md. at 609, 171 A. 2d at 463.

to buttress his intimation that the accused was lying in denying the convictions by referring to his criminal record on file with the F.B.I. The Court there said:

> "If the State's Attorney chooses not to offer appropriate evidence of the prior conviction, he should, under the dictates of *Cook*, seek leave of court to explain to the jury that he disclaims any intimation from his question that the defendant had previously been convicted of such crime. Failure to do so may result in an appellate reversal of the conviction where the error cannot be deemed harmless, and the point is properly preserved for review on appeal.
>
> "Appellants here entered no objection to the questions propounded by the State's Attorney, and neither moved for a mistrial nor sought an advisory instruction from the court as they might have done under *Cook*. Under these circumstances, the matter was not before the trial judge for a ruling and consequently is not properly before us for review. Maryland Rule 1085." (Citations omitted.) [11]

In *Reidy, supra,* where "self-defense was the heart and soul of appellant's defense," the prosecutor in closing argument stated:

> "It is really no self-defense here. It is a fiction manufactured by the defense counsel."

The court held the prosecutor's comment to be improper, and said:

> "The prosecutor's remark to the jury that appellant's claim of self-defense was 'a fiction manufactured by the defense counsel' could have been interpreted by the jury to mean that defense counsel suborned perjury or that he fabricated the

---

11. Woodell, *supra,* 2 Md. App. at 439, 234 A. 2d at 893-94.

defense, *or that the defendant himself committed perjury in testifying that he committed the homicide in self-defense.* And by declining defense counsel's request that the prosecutor apologize, and in finding nothing 'improper' in the prosecutor's remarks, the court's action may have been considered by the jury as tantamount to judicial approval of the propriety of such argument. And again, when defense counsel's statement to the jury that the prosecutor's remarks were improper, and constituted professional misconduct was objected to by the prosecutor, the trial judge did nothing to dispel the fact that the prosecutor's remarks had indeed been improper. It is against this background that we determine whether appellant's right to a fair trial was thereby so prejudiced as to constitute a denial of his right to a fair trial.[12]

. . .

"Where, as in the present case, the prosecutor's remarks had such a clear potential of prejudicing appellant's right to a fair trial, and objection was immediately made thereto on the ground that they were 'absolutely improper and out of order,' we think the situation thus created was one screaming out for the forceful interdiction of the trial judge and, at the least, a directive to the prosecutor to apologize to defense counsel for the remark — this being all that defense counsel had requested be done. But even without the apology sought by the appellant, it is not unlikely that the jury would have considered the prosecutor's remarks, standing alone, as the practical equivalent of an argument that the claim of self-defense was so far-fetched that it was utterly devoid of any merit. Had not the trial judge, therefore, in referring to the prosecutor's remarks, instructed the jury that 'it is

---

12. Reidy, *supra*, 8 Md. App. at 172, 259 A. 2d at 68.

no improper remark,' a different case may well have been presented than that now before us.

. . .

"We, of course, have no way of knowing whether the jury was actually misled or prejudicially influenced by the remarks in question. We do know, however, that self-defense was the heart and soul of appellant's defense, and that the prosecutor's remarks had a clear tendency, particularly when not neutralized by the trial judge, to convey the thought to the jury that defense counsel suborned perjury, or that he fabricated the defense, *or that the defendant himself committed perjury in testifying that he committed the homicide in self-defense.* With the case in this posture, it went to the jury and while it would appear from the record that appellant's claim of self-defense had little support in the evidence, nevertheless, ... '[c]onviction should be the result of a fair trial and not of the conclusions which a court of review may reach from a consideration of the evidence contained in the record where there has not been a fair trial.' " [13] (Emphasis added.)

Finally, in *Howard, supra,* where the accused's identification was central to the defense, the prosecutor in closing argument referred to an out-of-court photographic identification of the accused by the rape victim, which had not been introduced into evidence. The appellant made a prompt motion for mistrial. This Court held the argument improper and extremely prejudicial under the facts of that case, despite the victim's in-court identification of the accused and evidence of the presence of his fingerprints on the victim's car. This Court said:

"In the instant case it is true there was an in-court identification but the short time and the conditions under which the observation of the criminal was

---

13. *Id.,* at 178-79, 259 A. 2d at 71.

made render the identification more suspect than other identifications which are predicated upon a scrutiny of longer duration and under more favorable conditions. It is true, of course, that the fingerprints on the hood of the car evidence that the appellant's fingers had at some time come into contact with the hood of the car. With this record, we cannot say the jury would not have accepted the explanation, implausible though it may be, of the sixteen year old appellant that his prints were implanted while he was horseplaying on a parking lot in a shopping center. When the evidence concerning the prior photographic identification was improperly presented to the jury, we cannot say that the error was not prejudicial. Indeed, we find it to be extremely prejudicial and further find that the court's admonitions to disregard the statement were not sufficient to overcome this prejudice." [14]

The court reversed and ordered a new trial.

These cases unequivocally establish that the questions and assertions of the State's Attorney here, to which the appellant did initially object, were improper. The only significant question to be determined is whether this conduct was prejudicial in that it actually misled or was likely to have misled the jury or influenced it to the prejudice of the accused so that reversal of the conviction would be justified.

The record here shows that the only evidence to support the appellant's conviction consisted of his possession of the recently stolen automobile. His conviction hinged entirely upon the inference that, absent a satisfactory explanation, the possessor of recently stolen goods is the thief or the receiver.[15] Consequently, the appellant's only possible

**14.** Howard, *supra*, 19 Md. App. at 676-77, 313 A. 2d at 569.

**15.** Anglin v. State, 244 Md. 652, 656-57, 224 A. 2d 668, 670 (1966), *cert. denied*, 386 U. S. 947, 87 S. Ct. 984, 17 L.Ed.2d 877 (1967); Debinski v. State, 194 Md. 355, 360, 71 A. 2d 460, 462 (1950); Jordan v. State, 24 Md. App. 267, 274, 330 A. 2d 496, 501 (1975).

defense consisted of offering a satisfactory explanation as to how he came into possession of the automobile. The appellant promptly objected to conduct on the part of the State's Attorney which would place before the jury facts which the State's Attorney knew he was then unable to prove. Neither the State's Attorney nor the court took any action to overcome the likelihood of prejudice which had been created by the State's Attorney's original question and his unnecessary assertions that the report of the theft of the license tags was a matter of record and that it could be proved. The State's Attorney neither "withdrew" the objectionable question and statements, nor disclaimed any intimation that might be drawn from them, and the court did not inform the jury that the question and the assertions were improper, did not strike them, and did not admonish the jury to disregard them. Indeed, despite the fact that the appellant had objected to the State's Attorney's improper conduct, the court thereafter not only permitted but actually encouraged the State's Attorney to capitalize on the prejudicial effect of his previous improper conduct, by requiring the appellant to answer a persistent series of questions designed to support the inference that the license tags on the car found in the appellant's possession had, in fact, been stolen by him.

This is not a case in which the State had "overwhelming evidence" of guilt so that the impact of the State's Attorney's questions and assertions, even if improperly considered on the merits, was merely cumulative on the ultimate issue of guilt or innocence. Rather, the conduct of the State's Attorney affected the central issue of the case, namely, whether or not the appellant had a credible and satisfactory explanation of his possession of the recently stolen automobile. A credible explanation was the heart and soul of the appellant's defense and the prosecutor's questions and assertions had a clear tendency, particularly when not neutralized by the trial judge, to convey the thought to the jury that the appellant had committed perjury when he denied the theft of the license tags and, therefore, when he denied knowledge of the fact that the vehicle found in his possession was stolen property.

42

Trial judges have an obligation to afford an accused a fair and impartial trial. Even in the absence of an objection, and/or a request that the court admonish the State's Attorney, admonish the jury, strike the statements, or declare a mistrial, the trial court should have taken immediate corrective action.[16] I think, under the present circumstances, where the prosecutor's conduct had such a clear potential of prejudicing the appellant's right to a fair trial, and an objection was immediately made thereto on the ground that facts which the State's Attorney knew he was then unable to prove were being placed before the jury, the situation here, as in *Reidy, supra*, was "screaming out" for the forceful interdiction of the trial judge, and, at the least, a directive to the prosecutor that he disclaim to the jury any intimation from his questions and assertions that the appellant had stolen the plates from a Miss McCarthy. I would hold, on the facts of this case, that because of the improper nature of the prosecutor's questions and statements, the closeness of the case, the centrality of the issue affected by the error, and the trial judge's failure to take appropriate corrective action to mitigate the effects of the error, the judgment should be reversed.

Manifestly, I do not agree with the majority that the questions of whether certain of the State's Attorney's conduct during the trial was improper, prejudicial and, under the circumstances, warranted reversal, were not properly preserved for review. It has been recognized that where a defendant might otherwise be denied due process by the improper conduct of a State's Attorney during trial, not only is the trial court, even without an objection, obliged to take action, but also the appellate court, even without an objection, may and should on its own motion reverse a conviction.[17] Thus, in *Holbrook, supra*, in considering the

    **16.** Meno, *supra*, 117 Md. at 442, 83 A. at 761; Fryson v. State, 17 Md. App. 320, 326, 301 A. 2d 211, 214 (1973); Conway v. State, 7 Md. App. 400, 414, 256 A. 2d 178, 186 (1969); Holbrook v. State, 6 Md. App. 265, 271-72, 250 A. 2d 904, 907-08 (1969); *see* Cook, *supra*, 225 Md. at 609, 171 A. 2d at 463 (dictum); Contee v. State, 223 Md. 575, 584, 165 A. 2d 889, 894-95 (1960) (dictum).

**17.** Apple v. State, 190 Md. 661, 667-68, 59 A. 2d 509, 512 (1948).

preservation on appeal of the question of the impropriety and prejudicial effect of statements of a prosecutor, this Court said:

> "We note also that there is an obligation on the trial court in certain circumstances even in the absence of objection. In *Viereck v. United States,* 318 U. S. 236 the accused did not object at the time 'highly prejudicial' remarks were made by the prosecutor, but objected during the court's charge to the jury, which objection was overruled as too late. The Supreme Court said that the trial judge should have stopped counsel's discourse without waiting for an objection. In *Meno v. State, supra,* the Court said, regarding the 'highly improper' action of the State's Attorney in injecting an improper statement into the case (not in argument), that 'he should have been checked immediately by the Court, and the jury instructed to totally disregard his remark.' And the trial court's responsibility may not end with overruling [*sic*] an objection made. '[I]n addition to sustaining an objection to an improper remark or misconduct, (the trial court) is also entrusted with further responsibility to caution or reprimand the State's Attorney as the exigencies of the situation may require and to forthwith instruct the jury to disregard the unwarranted remarks and conduct of the prosecuting attorney.' *Contee v. State, supra,* 584. *And even absent an objection or action by the trial court, '[i]t is, of course, true that in a criminal case where grave error has been committed, and the accused is thereby denied due process, an appellate court may and should on its own motion, reverse the conviction.' Apple v. State, supra,* 667-668." [18] (Footnote omitted, emphasis added.)

Here the record shows that there was an objection to the

18. Holbrook, *supra,* 6 Md. App. at 271-72, 250 A. 2d at 907-08.

State's Attorney's conduct so that the question of its propriety and prejudicial effect was brought to the attention of the trial court at a time when it had an opportunity to correct the situation. When read in context, the record shows that the appellant had denied that he had stolen the plates subsequently found on the vehicle in his possession, from his friend, Miss McCarthy. Thereafter, the State's Attorney asked: "Would it surprise you to know that she reported [the license plates] as stolen to the Alexandria police?" The appellant objected, "[u]nless the State can prove that." The ground of his objection, while not articulated, when read in context, was plain. He was objecting to conduct on the part of the State's Attorney which would implant in the minds of the jury facts which were not in evidence and which the State's Attorney knew full well he was then unable to prove. The State's Attorney not only indicated that he was then unable to prove that the plates had been reported as stolen, which was all that was necessary to respond to the appellant's objection, but went further by stating, in the presence of the jury: "It is a matter of record. It could be proved." While the trial court made no statement on the record that the objection to the State's Attorney's initial question was overruled, its subsequent conduct in failing to take action with respect to the State's Attorney's improper assertions and in requiring the appellant to answer a persistent series of questions designed to support the inference that the license tags on the car found in the appellant's possession had, in fact, been stolen by him, makes it obvious that the objection was implicitly overruled. Thereafter, it was not necessary, in my view, for the appellant, in order to preserve the point for review, to repeat his objection or move to strike or move for a mistrial, as the State's Attorney's improper conduct continued.[19]

The simple fact disclosed by this record is that the appellant, at the earliest possible moment, objected to the State's Attorney's improper conduct and that that objection

---

19. Shoemaker v. State, 228 Md. 462, 467, 180 A. 2d 682, 684 (1962); see Contee, supra, 223 Md. at 583, 165 A. 2d at 894 (dictum).

was not sustained. As a result, the appellant was severely prejudiced. So far as I am concerned, under these circumstances, the questions of whether the State's Attorney's conduct was improper, prejudicial and warranted reversal, were properly preserved.

I respectfully dissent.